

FILED
9/4/2014
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JEFFREY BERKOWITZ, and JEFFREY BERKOWITZ, individually<br><br>              Plaintiffs,<br><br>v.<br><br>ACORN OFFICE PRODUCTS LLC; AUTOMATION AIDS; COMPUTER SYKES INC.; A&E OFFICE AND INDUSTRIAL SUPPLY; SUPPORT OF MICROCOMPUTERS ASSICIATED; WOW IMAGING PRODUCTS LLC; APRISA TECHNOLOGY LLC; ENTERPRISE TECHNOLOGY SOLUTIONS; FIRSTCALL OFFICE SOLUTIONS; SUPPLY SAVER CORPORATION; UNITED OFFICE SOLUTIONS, INC.; and VEE MODEL MANAGEMENT CONSULTING,<br><br>              Defendants. | Case No. 13-cv-8185<br><br>CHIEF JUDGE CASTILLO<br><br><br>FILED UNDER SEAL<br><br>JURY TRIAL DEMANDED<br><br><br><br>FALSE CLAIMS ACT COMPLAINT |

The United States of America *ex rel.* Jeffrey Berkowitz, and Jeffrey Berkowitz, individually ("Plaintiffs"), by and through their attorneys McKnight & Kennedy, LLC and Behn & Wyetzner, Chtd., state as follows for their complaint against; Acom Office Products LLC ("Acom"); Automation Aids ("Automation"); Computer Sykes, Inc. ("Sykes"); A&E Office and Industrial Supply ("A&E"); Support of Microcomputers Associated ("SOMA"); Wow Imaging Products LLC ("Wow"); Aprisa Technology LLC, ("Aprisa"); Enterprise Technology Solutions ("Enterprise"); FirstCall Office Solutions ("FirstCall"); Supply Saver Corporation ("Supply Saver"); United Office Solutions, Inc. ("United"); and Vee Model Management Consulting ("Vee") (collectively "Defendants"):

## I.    INTRODUCTION

1.    The United States of America, through the Relator Jeffrey Berkowitz ("Relator," "Relator Berkowitz," or "Berkowitz"), and Relator seek to recover treble damages and civil penalties arising from false statements and claims made, used or caused to be made by Defendants to the United States, in violation of the federal False Claims Act, 3I U.S.C. §§ 3729-33, *et seq.*

2.    Defendants are vendors that sell products to the United States Government through the U.S. Government's administrative agency, the General Services Administration ('GSA"). Vendors are required to only sell to the United States Government products that are manufactured in so-called "'designated countries" – countries that are recognized under certain international treaties detailed herein. Defendants certified to the United States Government that the products they are offering to the U.S. Government were manufactured in designated countries, when they were not, when they were manufactured in nondesignated countries, including China, Thailand, and the Philippines. In offering and selling products from nondesignated countries while certifying that those products were from designated countries, Defendants made false claims in violation of the False Claims Act.

3.    The GSA is an agency of the United States Government that handles many administrative functions for the United States Government, including purchasing and acquisitions. It maintains and awards Federal Supply Schedule (.FSS") contracts, which are indefinite delivery, indefinite quantity contracts with commercial firms to provide supplies and services to Government agencies throughout the world. The FSS is divided into several "schedules," each of which is a vehicle to buy and sell a certain type of product.

4.    For example Schedule 70 is devoted to 'General Purpose Commercial Information Technology Equipment, Software, and Services." Vendors that wish to offer

information technology ("IT") supplies to the Government through the GSA must apply and obtain a schedule contract under Schedule 70. Additionally, vendors sell packaging and shipping supplies on Schedule 81, hardware supplies on Schedule 51, janitorial supplies and linens on Schedule 73, building supplies and material handling on Schedule 56, and office supplies and related products on Schedule 75.

5.      The GSA negotiates each vendor schedule contract and attempts to achieve an agreement that achieves the best value for the U.S. Government. The GSA also requires that all of its vendor schedule contracts comply with U.S. Government regulations, policies, and procurement objectives.

6.      Compliance with the federal Trade Agreements Act ("TAA") (19 U.S.C. § 2501 *et seq.)* is one of the requirements that all vendors seeking GSA contracts must meet. The GSA, on its website, states that the TAA is:

> [T]he enabling statute that implements numerous multilateral and bilateral international trade agreements and other trade initiatives. Since the estimated dollar value of each Schedule exceeds the established Trade Agreements Act (TAA) threshold, the TAA is applicable to all Schedules. *In accordance with the TAA, only U.S.-made or designated country end products shall be offered and sold under Schedule contracts.*

GSA website, at http://vvww.gsa.gov /portal/content/200369?utm source=FAS&utm mediwn = print-radio&utm tenn=schedules-ordering&utm campaign=shortcuts, visited October 31, 20 13 (emphasis supplied). In other words, with very rare exceptions, products sold to the Government through the GSA must have been manufactured either in the U.S. or a "designated country." [t is illegal to sell the U.S. Government products on GSA Schedules that were manufactured in a nondesignated county.

7.      The U.S. Government maintains a list of designated countries. Under GSA regulations, GSA vendors are not allowed to offer any product covered by the World Trade

Organization's Government Procurement Agreement for sale on the FSS Schedule if the product does not originate in a designated count.ry.[1] For Example. China and Thailand are two countries that are *not* designated countries.

8.     Defendants in this case are entities that have entered into vendor schedule contracts with the GSA to provide office supplies, information technology equipment, and other products to the U.S. Government. As such, they have certified compliance with applicable laws and regulations, including the TAA.

9.     Relator Jeffrey Berkowitz, discovered that Defendants have been selling products which are not designated country end products. He found this information as a regular part of duties as president of a company that sells products and services to the Government agencies. Particularly, Relator unearthed that Defendants were selling products made in nondesignated countries, in violation of GSA regulations -- thus, these products were unlawfully sold to the Government.

10. Relator Berkowitz discovered that Defendants were holding out these products as having been produced in designated countries.

11. These purchases are "claims" for the purposes of the federal False Claims Act, 31 U.S.C. § 3729 *ET SEQ.* (--FCA.).

12. For claims prior to June 7, 2008, 31 U.S.C. § 3729(a)(2) holds liable any person who .knowingly makes, uses, or causes to be made or used, a false record or statement *to get a false or fraudulent claim paid or approved by the Government."* (Emphasis added.)

_____

[1] In rare circumstances, a contracting officer can find that an exception applies as defined by the Federal Acquisition Regulations. Such exceptions are not at issue here.

13.     For claims after June 7, 2008, 31 U.S.C. § 3729(a)(1)(B) holds liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false or fraudulent claim." (Emphasis added.)

14.     Based on these provisions, Relator Berkowitz seeks to recover damages and civil penalties arising from Defendants' material false statements and presentation of false claims to the United States in connection with the sale of products from nondesignated countries in violation of the World Trade Organization-Government Procurement Act, the Trade Agreements Act, GSA contracts and policies. and applicable Federal Acquisition Regulations, including but not limited to "FAR Subpart 25.4 -Trade Agreements."

15.     Relator Berkowitz has direct and independent knowledge that the Defendants are selling products to the United States Government that did not originate in designated countries under the TAA, and are therefore making material false statements and presenting false claims to the United States.

**U.      JURISDICTION AND VENUE**

16.     This is a civil action arising under the laws of the United States to redress violations of 3 1 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over the subject matter of this action pursuant to: (i) 31 U.S.C. *§* 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 3 1 U.S.C. §§ 3729 and 3730; (ii) 28 U.S.C. § 133l,which confers federal subject matter jurisdiction; and. (iii) 28 U.S.C. § 1345, because the United States is a plaintiff.

17.     This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation, or in a Government Accounting Office or Auditor Generat·s report, hearing. audit. or investigation, or from the news media.

5

18. To the extent that there has been a public disclosure unknown to Berkowitz, Berkowitz is an original source under 31 U.S.C. § 3730(e)(4). He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under the False Claims Act based on the information.

19. Relator Berkowitz has provided to the Attorney General of the United States and to the United States Attorney for the Northern District of Illinois a statement summarizing known material evidence and information related to the Complaint, in accordance with the provisions of 31 U.S.C. § 3730(b)(2). These disclosure statements are supported by material evidence.

20. This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because Defendants can be found, reside, or transact business in this District, and because an act proscribed by 31 U.S.C. § 3729 occurred in this District. Defendants presented false or fraudulent claims to the United States in this District.

21. Venue is proper in this District under 31 U.S.C. § 3732 (a) and 28 U.S.C. § 1391.

## ID. PARTIES

22. Relator Berkowitz is a resident of Freeport, New York. At all times relevant herein, he has worked as the president of Complete Packaging and Shipping Supplies, Inc., selling products and services to the federal Government agencies. In this capacity, he gained direct and independent knowledge of the allegations contained in this Complaint.

23. Defendant Acorn Office Products has offices at 706 Rt. 15 South, Suite 201C, Lake Hopatcong, New Jersey 07849. Acom has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-02F-0109U.

24.     Defendant Automation Aids has offices at 420 Babylon Road, Suite **B,** Horsham, Pennsylvania. 19044. Automation Aids has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-14F-1242H.

25.     Defendant Computer Sykes, Inc. has offices at 2250 N. Druid Hills Road NE, Atlanta, Georgia 30329-3192. Sykes has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-35F-0541V.

26.     Defendant A&E Office & Industry Supply has offices at 10302 Park Meadow Drive, Houston, Texas 77089-2200. A&E has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract numbers GS-02F-0059Y and GS-35F-0427X.

27.     Defendant Support of Microcomputers Associated (d/b/a "SOMA") has offices at 2212 Walnut Street, Philadelphia, Pennsylvania 19103. SOMA has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-02F-0046W.

28.     Defendant WOW Imaging Products LLC has offices at 4061 Tilden Drive, Roseville, California 95661-7949. Wow has sold and continues to sell products to the U.S. Government under GSA contracts including but not limited to contract number GS-02F-0161R.

29.     Defendant Aprisa Technology LLC. has offices at 24 Lumber Rd., Roslyn, NY 11576. Aprisa has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-35F-0536T.

30.     Defendant Enterprise Technology Solutions has offices at 7199 W. Woodbury Ct., Pleasanton, CA 94566. Enterprise has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-35F-0329X.

31.     Defendant FirstCal1 Office Solutions has offices at 2538 W. 7m Street, Los Angeles, CA 90057. FirstCall has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-02F-O182S.

32.     Defendant Supply Saver Corporation has offices at 1324 Wyckoff Rd., Ste. 103, Neptune, NJ 07753. Supply Saver has sold and continues to sell products to the federal Goverrunent under GSA contracts including but not Limited to contract number GS-02F-0090N.

33.     Defendant United Office Solutions has offices at 16180 Highway 7, Ste. 2, Minnetonka, MN 55345. United Office Solutions has sold and continues to seU products to the federal Government under GSA contracts including but not limited to contract numbers GS-02F-0275P.

34.     Defendant Vee Model Management Consulting has offices at 520 Central Pkwy E., Ste. 11 7, Plano, TX 75074. Vee has sold and continues to sell products to the federal Goverrunent under GSA contracts including but not limited to contract number GS-02F-0275P.

## IV.     THE FEDERAL FALSE CLAIMS ACT

35.     The FCA, originally enacted during the Civil War, was substantially amended by the False Claims Amendments Act of 1986, which were signed into law on October 17, 1986. Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the FCA. Congress acted after finding that fraud in federal programs and procurement was, and remains, pervasive and that the FCA, which Congress characterized as the primary tool for combating fraud in Government contracting, was in need of modernization.

36.     The FCA provides for any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for

8

each such claim, plus three times the amount of the damages sustained by the Governmen as well as attorneys' fees. The FCA allows any person having infonnation regarding a false or fraudulent claim against the Government to bring a private cause of action for himself and on behalf of the Government and to share in any recovery. The complaint is to be filed under seal for sixty days (without service on the Defendants during such sixty-day period) to enable the Government (a) to conduct its own investigation without the Defendants' knowledge, and (b) to determine whether to join the action.

37.     The FCA was further amended by the Fraud Enforcement Recovery Act c-·FERA") passed by Congress and signed into law on May 20, 2009 for the express purpose of strengthening the tools available to combat fraud and to overturn judicial decisions that had weakened the false Claims Act. Pub. L. No. 1 11-2I, 123 Stat. 1617 (2009).

38.     While most of the new provisions apply only to claims after the effective date of the statute, Congress determined that 31 U.S.C. § 3729(a)(1)(B), which revised the former section designated as 31 U.S.C. § 3729(a)(2) pertaining to liability for false statements, "...shall take effect as if enacted on June 7, 2008, and shall apply to all claims...that are pending on or after that date." § 4(t) of FERA, 123 Stat. at 1625 (see note following 31 U.S.C. § 3729).

39.     For claims prior to June 7, 2008, 31 U.S.C. § 3729(a)(2) holds liable any person who 'knowing ly makes, uses, or causes to be made or used, a false record or statement *to get a false or fraudulent claim paid or approved by the Government." Id.*   (Emphasis added.)

40.     For claims after June 7, 2008, 31 U.S.C. § 3729(a)(1)(B) holds liable any person who "knowing ly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." *Id*   (Emphasis added.)

41.     The FCA defines a "claim'" as:

9

(A)     [...] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that –

    (i)     is presented to an officer, employee, or agent of the United States; or

    (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government –

        (I)     provides or has provided any portion of the money or property requested or demanded; or

        (II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B)     does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

31 U.S.C. § 3729 (b)(2).

42.     All U.S. government purchases from Defendants through the GSA of equipment certified by Defendants to come from a designated country, where that equipment was actually manufactured in a nondesignated country, are "claims" for the purposes of the FCA.

## V.     THE GENERAL SERVICES ADMINISTRATION AND THE FEDERAL SUPPLY SCHEDULE

43.     The GSA is an agency of the Federal Government that handles many administrative functions for the Federal Supply Schedule ("FSS") contracts, which are indefinite delivery, indefinite quantity contracts with commercial firms to provide supplies and services to Government agencies throughout the world. The FSS is divided into several "schedules," each

of which is a vehicle to buy and sell a certain type of product. *See* FAR Subpart 8.4 – Federal Supply Schedules.[2]

44.    For example, Schedule 70 is devoted to "General Purpose Commercial Information Technology Equipment, Software, and Services." Vendors that wish to offer IT supplies to the Government through the GSA must apply and obtain a schedule contract under Schedule 70. *See* FAR Subpart 38.1 -Federal Supply Schedule Program. Additionally, vendors sell packaging and shipping supplies on Schedule 81, hardware supplies on Schedule 51, janitorial supplies and linens on Schedule 73, building supplies and material handling on Schedule 56, and office supplies and related products on Schedule 75.

45.    The GSA negotiates each contract and attempts to achieve an agreement that achieves the best value for the Government, and complies with the United States' policy and procurement objectives. *See* FAR Subpart 8.1 *et seq.* Government contracting officers may purchase products through the GSA Advantage web portal, and may assume that the product price is fair and reasonable. They can also assume that vendors with schedule contracts are compliant with all applicable laws and regulations.

## VI.    THE TRADE AGREEMENTS ACT

46.    Vendors selling products to the federal Government must obey under the FSS Contract the Trade Agreements Act of 1979, 19 U.S.C. § 2501 *et seq.* ("TAA"). Congress articulated its reasons for passing the TAA at 19 U.S.C. § 2502. One of these reasons is the approval and implementation of trade agreements negotiated under the Trade Act of 1974. *Id.* at § 2502(1).

---

[2] The FGSA's procurement functions are largely regulated by what are commonly referred to as the "FAR," or Federal Acquisition Regulations.

47.     Congress and the President, by virtue of this legislation, endorsed and accepted certain trade agreements and mechanisms to implement these agreements. The covered agreements are listed at 19 U.S.C. § 2503(c).

48.     Subsection (c)(3) applies the Trade Agreements Act to the Agreement on Government Procurement. 19 U.S.C. § 2503(c)(3) (1979).

49.     Under the terms of the World Trade Organization Government Procurement Agreement («WTO GPA',), signatory countries have agreed to allow industries from WTO member countries to freely participate in certain aspects government procurement on equal footing with domestic companies.

50.     For example, under this agreement industries based in Great Britain are allowed to freely compete for federal Government contracts in the United States of America on an equal footing with United States domestic companies. Similarly, companies from the United States of America can freely compete for contracts issued by Great Britain.

51.     The United States has determined, through the TAA and Federal Acquisition Regulations that the WTO GPA applies to a number of agencies, including the GSA.

52.     What this means in practical terms is that federal procurement regulations which must be followed by vendors selling products and equipment to the U.S. Government through the GSA and to states like Illinois through the Cooperative Purchasing program, forbid: (a) the sales to certain federal agencies, including the GSA; (b) of certain products, including information technology products; (c) that are from so-called "nondesignated countries," except under limited circumstances, not applicable here.

53.     "Nondesignated countries" are countries with which the United States does not have an official trade agreement under the WTO GPA, and they include the People's Republic of China, Malaysia, Thailand, and the Philippines.

54.     The WTO GPA does not apply to all end products from foreign countries. Dollar thresholds, based upon the total dollar value of the procurement, have been established to mark the point at which the WTO GPA restrictions would begin to apply. *See* FAR Subpart 25.402 ("The value of the acquisition is a determining factor in the applicability of trade agreements.")

55.     To decide whether eligible products from WTO GPA countries are entitled to non-discriminatory treatment, GSA contracting officers apply sections of the FAR, basing the threshold upon projected sales for the calendar year to establish the threshold. The threshold is adjusted every two years. In 2007, the TAA threshold for WTO GPA products was $193,000.00. It was raised to $194,000.00 on January 15, 2009. There is no annual period when any of the Defendants had sales less than $193,000.00. Therefore the TAA threshold was always met, and the TAA applied to these Defendants at all times.

## VII.     FEDERAL ACQUISITION REGULATIONS REQUIRE VENDORS TO BE COMPLIANT WITH THE TAA

56.     FAR 52.225-5 defines critical terms such as ••Designated Country," and specifically identifies the countries that are recognized as such. FAR 52.225-5 (a). The clause also identifies the countries that are not considered to be "designated," by not including them on the list. As the People's Republic of China, Malaysia. and the Philippines fall into the latter category, they are not designated countries. FAR 52.225-5 also states that the '"designated country end product" means a product produced in one of the listed countries. *Id.*

57.     FAR 52.225-5 states that in most instances, the contractor is prohibited from *delivering* products under the contract that are not US made or from designated countries. FAR 52.225-5 (b) (emphasis supplied). At subsection (b), the clause asserts:

> The Contracting Officer has determined that the WTO GPA and FTAs apply to this acquisition. Unless otherwise specified, these trade agreements apply to all items in the Schedule. *The Contractor shall deliver under this contract only US-made or designated country end products except to the extent that in its offer, it*

*specified the delivery of other end products in the provision entitled "Trade Agreements Certificate."*

*Id.* at subsection (b) (emphasis supplied).

58.    The Trade Agreements Certificate is FAR 52.225-6, which by the terms of FAR 25.11 (c) (2) is required to be completed each time that FAR 52.225-5 is used. FAR 25.1101 (c)(2). This certificate has two parts, Subsection (a) and Subsection (b). Contractors or vendors executing FAR 52.225-6 (a), "certify that each end product, except those listed in paragraph (b) of this provision, is a U.S.-made or designated country end product as defined in the clause of this solicitation entitled 'Trade Agreements.'" FAR 52.225-6 (a). Under subsection (b), the contractor must list with particularity all of those end products that *are not US-made and/or were not produced in a designated counrry. See* FAR 52.225-6(b) (emphasis supplied).

59.    Information about the country of origin of the end product is material to all Government contracting officials because they do not have the authority to purchase a WTO-GPA end product that is not U.S.-made or from a designated country except under extremely Limited circwnstances. Moreover, at all times relevant herein, the FAR Clause 52-225-5, has been included in the contracts between the United States and the Defendants, and Defendants have certified compliance as a condition of doing business with the Government.

60.    FAR subpart 25.5 describes the process for contracting officers to use to evaluate foreign goods. FAR 25.502(b) specifically addresses the procedures for a contracting officer to follow when dealing with acquisitions covered by the WTO GPA. FAR 25.502 (b). Contracting officers must "consider only offers of U.S.-made or designated country end products, unless no offers of such end products were received." FAR 25.502 (b)(l). Once the contracting authority identifies the eligible offers, he or she must give equal consideration to end-products from the U.S. and designated countries and make the award based upon the lowest price. FAR 25.502

(b)(2). Only when there are no offers of U.S.-made or designated country made end products, can the contracting officer then buy products from a nondesignated country. FAR 25.502 (b)(3).

61.     Read together, FAR 52.225-5(b) and FAR 25.502 (b) severely reduce the likelihood of any foreign product from a nondesignated country reaching a federal facility. Ifthe vendor does not list the foreign item as originating in a nondesignated country pursuant to FAR 52.225-5 (b) and FAR 52-225-6 (b), the vendor cannot "deliver" the product to the Government. The use of the world "deliver" means that even if a contracting officer mistakenly purchases such an item, the vendor has an independent obligation not to deliver it, if the vendor failed to properly identify the product and its country of origin under FAR 52.225-5 (b) and FAR 52-225-6(b).

62.     The Trade Agreements Certificate regulations are set forth at FAR 52.225-6, which by the terms of FAR 25.11 (c) (2) must be completed each time that FAR 52.225-5 is utilized. FAR 52.225-5 should have been a part of each of the Agreements between the United States Government and the defendants and therefore, the FAR 52.225-6, Trade Agreements Certificate, was required to be completed by Defendants.

63.     A contracting officer can only buy the end product from the nondesignated country if there are *no* available products from the U.S. or a designated country. FAR 25.502 (b)(2) (emphasis supplied).

64.     Unless there are no products available on the relevant GSA Schedule from the U.S. or a designated country, therefore, it is illegal for vendors to sell IT products that were manufactured in a nondesignated country, including but not limited to those manufactured in China.

65.     The GSA specifically notifies all vendors and potential Government customers that the TAA applies to all products and contracts awards under the FSS. At its web site, the

15

GSA states: •"The Trade Agreements Act (l9 U.S.C. § 2501, *et seq.)* is the enabling statute that implements numerous multilateral and bilateral international trade agreements and other trade initiatives. Since the estimated dollar value of each Schedule exceeds the established Trade Agreements Act (TAA) threshold the TAA is applicable to all Schedules. In accordance with the TAA, only U.S.-made or designated country end products shall be offered and sold under Schedule contracts."

*See* http://www.gsa.gov./Portal/gsa/ep/program View.do?programid= 15819&programPage=%2 Fep%2Fproirram%2F gsaOverview. jsp&P=FX7&pageTypeid=171 12&ooid=8 l06&channe1Id= 2473 1, visited October 31, 2013.

66.     Under GSA procurement policies, vendors are not allowed to offer a product covered by the WTO GPA for sale on the FSS Schedule that does not originate in a designated country.[3]

67.     The GSA has consistently advised vendors of the need to comply with the Trade Agreements Act. In ••"GSA Steps," a newsletter published by the GSA and disseminated to vendors, the GSA commented in Issue No. 10, March 2006, at page 2:

> As a reminder, in solicitation provision FAR 52.212-3 (f)(2), Offeror Representations and Certifications-Commercial Items. you must include a comprehensive list of those offered items that are obtained from sources other than the U.S. or designated country. In this same paragraph, your firm certifies to the accuracy of that representation. Any item not identified as from other than a designated country is considered to be compliant with the Trade Agreement clause of the contract.
>
> We urge you to review the products offered under your contract to ensure your company is compliant with the TAA requirements. You need to know where your contract products are produced or "substantially transformed" and compare that information to the countries listed in the various multilateral and bilateral international trade agreements and other trade initiatives as implemented by the Trade Agreements Act. If problems exist, we will work with you to address

---

[3] In rare circumstances, a contracting officer can find that an exception applies as defined by the Federal Acquisition Regulations. Such exceptions are not at issue here.

compliance issues; however, be aware that the contractor is ultimately responsible for compliance with the Trade Agreements act in accordance with clause 52.225-5 Trade Agreements. As a reminder, in solicitation provision FAR 52.212-3 (f)(2), Offerer Representations and Certifications-Commercial Items, you must include a comprehensive list of those offered items that are obtained from sources other than the U.S. or designated country. In this same paragraph, your firm certifies to the accuracy of that representation. Any item not identified as from other than a designated country is considered to be compliant with the Trade Agreement clause of the contract.

68.     Prior to that in an earlier issue of "GSA Steps" (Issue No. 8, September 2005), the

GSA stated:

Incorporated in al GSA Multiple Award Schedule contracts is FAR Clause 52.225-5, Trade Agreements. Ttlls clause is included in contract clause 52.212-3, Offerer Representations and Certifications-Commercial [tern s. When you signed your contract, you certified that all end products offered on your contract comply with the terms of the FAR 25.4, Trade Agreements. This applies to all of the products on your contract, whether you have one product or 10,000. The Trade Agreements Act applies to services, too.

69.     The September 2005 issue of GSA Steps- also explained how GSA vendors

should collect information from manufacturers about the country of origin. GSA advised

vendors to keep a database to track the source of each product. In additio if a vendor

discovered a product from a nondesignated country during a review or audit, GSA urged the

vendors to "immediately notify your Procuring Contracting Officer (PCO) and request a

modification to remove those products from your contract."

70.     The September 2005 GSA Steps warned vendors of potential TAA liability:

Perhaps you [a contractor] saw the media coverage in late May about a major office products retailer reaching a $9.8 million settlement with U.S. Department of Justice over violations of U.S. trade regulations. Perhaps that slipped under your radar or you did not think about that issue and how it related to your GSA Multiple Award Schedule contract. If so, think again.

17

VIII. DEFENDANTS PRESENTED FALE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NONDESIGNATED COUNTRIES WHEN DEFENDANTS CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES.

71.     By selling products to the United States Government that did not originate in designated countries under the TAA Defendants made material false statements and presented false claims to the U.S. Government for payment. Relator Berkowitz has direct and independent knowledge of these facts.

72.     Because Defendants did not properly or truthfully complete the Trade Agreements Certificate, FAR 52.225-6, and specify the products from nondesignated countries that it intended to offer under the contract, Defendants were contractually bound to only offer products from designated countries. ('The Contractor shall deliver under this contract only U.S.-made or designated end products except to the extent that, in its offer, it specified delivery of other end products in the provision entitled •Trade Agreements Certificate.' "). By offering and selling products from nondesignated countries in the face of misrepresentations and omissions in their Trade Agreements Certificates. Defendants knowingly violated the duties contained in these certifications.

73.     Defendants sold these products from nondesignated countries to the Government and presented false claims for the payment for the sale of these items.

74.     The Goverrunent sustained damages because of Defendants' actions.

IX.     RELATOR DISCOVERS THE FRAUD

75.     Relator Berkowitz is the President of Complete Packaging and Shipping Supplies, lnc. (hereinafter .Complete Packaging") which is located at 83 Bennington Avenue, Freeport, New York 11520. Complete Packaging sells a wide variety of products such as office supplies,

packaging and shipping supplies, hardware and tools, information technology products, and janitorial and maintenance supplies to many Government departments and agencies.

76.     Complete Packaging is one of several companies that provide this service. In the industry, Complete Packaging is known as a ••yAR", which stands for "Value Added Reseller". VARs are businesses that combine, configure and sell products manufactured by other companies in specifically designated configurations to meet the needs of their customers. VARs do not manufacture any product. Essentially, VARs are middlemen in the supply chain between the manufacturers and their ultimate Government customers. VARs make their profits on the difference between the discount cost of the product to them and the marked-up price paid by the ultimate customer. Both the manufacturer and the ultimate customer benefit from the presence of the VAR.

77.     Relator Berkowitz, as a regular part of his duties, sells his services and products through GSA contracts to Government departments and agencies through GSA Advantage, Blanket Purchase Agreements, FedBid, Multiple Award Schedules, Federal Business Opportunities, and other Government sales portals.

78.     In around 2005, Berkowitz became aware that non-compliant products are being offered for sale to the Government by several vendors. He noticed that various vendors on GSA Advantage were selling items that were not from TAA compliant countries.

79.     In the routine course of operating Complete Packaging, Berkowitz received product lists that identified the country of origin for each product. As he assembled and sold products to government customers, Berkowitz carefully screened the non-compliant products, but discovered that many competitors with government contracts were not abiding by the requirements of the TAA.

80.     Berkowitz collected data regarding products sold by several of his competitors and discovered that hundreds of non-compliant products were in fact being sold to the United States Government in violation of the TAA and the express certifications required by GSA Advantage.

81.     AdditionaJly, Berkowitz has become aware of non-compliant products made by numerous manufacturers being offered for sale to the Government by several of his competitors.

82.     As part of his investigation into this matter, Berkowitz gathered reports that compared products that were not TAA compliant with sales that were made on GSA Advantage. Despite the fact that vendors listing of GSA Advantage must only offer and sell TAA compliant products, many of the sales included non-compliant products.   Comparing the sales data with the country of origin charts in his possession, it was evident that vendors, including Defendants, were selling products to the United States Government that did not originate in a designated country.

83.     Relator Berkowitz gathered information showing that Defendant Acorn sold at least 30,933 non-compliant products between April 1, 2010 and June 2013, worth a total of $967,470.62.   These sales are representative of further non-compliant sales by Acorn to the Government.   Exhibit A to the Complaint lists these 30,933 representati ve sales.

84.     Relator Berkowitz gathered information showing that Defendant Automation sold at least 19,697 non-compliant products between April 1, 2010 and June 2013, worth a total of $1.015,448.87.   These sales are representative of further non-compliant sales by Automation to the Government.   Exhibit **B** to the Complaint lists these 19,697 representative sales.

85.     Relator Berkowitz gathered information showing that Defendants Sykes sold at Least 20.630 non-compliant products between April 1, 2010 and June 2013, worth a total of

$903,673.07.   These sales are representative of further non-compliant sales by Sykes to the Government.  Exhibit C to the Complaint lists these 20,630 representative sales.

86.     Relator Berkowitz gathered information showing that Defendant A&E sold at least 16,751 non-compliant products between April 1, 2010 and June 2013, worth a total of $590,645.22.   These sales are representative of further non-compliant sales by A&E to the Government.  Exhibit D to the Complaint lists these 16,751 representative sales.

87.     Relator Berkowitz gathered information showing that Defendant SOMA sold at least 15,525 non-compliant products between April 1, 2010 and June 2013, worth a total of $1,333,343.70.  These sales are representative of further non-compliant sales by SOMA to the Government.  Exhibit E to the Complaint lists these 15,525 representative sales.

88.     Relator Berkowitz gathered information showing that Defendant Wow sold at least 6,854 non-compliant products between April 1, 2010 and June 2013, worth a total of $944,015.30.   These sales are representative of further non-compliant sales by Wow to the Government.  Exhibit F to the Complaint lists these 6,854 representative sales.

89.     Relator Berkowitz gathered information showing that Defendant Aprisa sold at least 18,431 non-compliant products between April 1, 2010 and June 2013, worth a total of $537,622.81.   These sales are representative of further non-compliant sales by Aprisa to the Government, Exhibit G to the Complaint lists these 18,431 representative sales.

90.     Relator Berkowitz gathered information showing that Defendant Enterprise sold at least 7441 non-compliant products between April 1, 2010 and June 2013, worth a total of $555,698.70.  These sales are representative of further non-compliant sales by Enterprise to the Government.  Exhibit H to the Complaint lists these 7441 representative sales.

91.     Relator Berkowitz gathered information showing that Defendant FirstCall sold at least 21,742 non-compliant products between April 1, 2010 and June 2013, worth a total of

$620,243.81. These sales are representative of further non-compliant sales by FirstCall to the Government. Exhibit I to the Complaint lists these 21,742 representati ve sales.

92.    Relator Berkowitz gathered information showing that Defendant Supply Saver sold at least 5087 non-compliant products between April 1.2010 and June 2013, worth a total of $922,843.90. These sales are representative of further non-compliant sales by Supply Saver to the Government. Exhibit J to the Complaint lists these 5087 representative sales.

93.    Relator Berkowitz gathered information showing that Defendant United sold at least 12,216 non-compliant products between April 1, 2010 and June 2013, worth a total of $597,97 l.74. These sales are representative of further non-compliant sales by United to the Government. Exhibit K to the Complaint lists these 12.216 representative sales.

94.    Relator Berkowitz gathered infonnation showing that Defendant Vee sold at least 1743 non-compliant products between April 1. 2010 and June 2013, worth a total of $381,935.39. These sales are representative of further non-compliant sales by Vee to the Government. Exhibit L to the Complaint lists these 1743 representative sales.

95.    Defendant knowingly sold these products from nondesignated countries to the U.S. Government, while falsely certifying they were from designated countries. Defendants then presented false claims for the payment for the sale of these items. The Government sustained damages because of Defendants' actions.

<u>COUNT I</u>
*(False Claims Act, 31 U.S.C. § 3729 (a}(l))*

96.    Plaintiff Berkowitz alleges and incorporates by reference the allegations made in Paragraphs 1 through 95 of this Complaint.

97.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

22

98.    By virtue of the acts described above, the Defendants knowingly submitted, and caused to be submitted, false or fraudulent claims for payment and reimbursement by the United States Government *before June* 7, *2008.* and the United States, unaware of the falsity of the records, statements and/or claims made by the Defendants and in reliance on the accuracy thereof, paid for aforementioned false claims because the Defendants intentionally or with gross disregard for the truth sold products to the Government that did not originate in the United States or a designated country.

99.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. *§* 3729 and have thereby damaged and continue to damage the United States Government by its actions in an amount to be determine at trial.

## COUNT II
*(False Claims Act, 31 U.S.C. § 3729 (a)(J)(A))*

100.    Plaintiff Berkowitz alleges and incorporates by reference the allegations made in paragraphs 1 through 99 of this Complaint.

101.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

102.    By virtue of the acts described above, the Defendants knowingly submitted, and caused to be submitted, false or fraudulent claims for payment and reimbursement by the United States Government *After June* 7, *2008,* and the United States, unaware of the falsity of the records, statements and/or claims made by the Defendants and in reliance on the accuracy thereof, paid for aforementioned false claims because the Defendants intentionally or with gross disregard for the truth sold products to the Government that did not originate in the United States or a designated country.

23

103.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729 and have thereby damaged and continue to damage the United States Government by its actions in an amount to be determined at trial.

## COUNT III
*(False Claims Act, 31 U.S.C. § 3729 (a)(2))*

104.    Plaintiff Berkowitz realleges and incorporates by reference the allegations made in Paragraphs 1through 103 of this Complaint.

105.    This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

106.    By virtue of the acts described above, the Defendants defrauded the United States by failing to adhere to the Trade Agreements Act clauses.

107.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used, material false statements to obtain Federal Government payment for false or fraudulent claims because the Defendants falsely represented the country of origin of the products that it sold and offered for sale to the United States Government *before June* 7, *2008* in violation of the Trade Agreements Act.

108.    The United States Government relied upon these statements and has been damaged and continues to be damaged in substantial amounts. The exact amount of the damage is to be determined at trial.

## COUNT IV
*(False Claims Act, 31 U.S.C. § 3729 (a)(1)(B))*

109.    Plaintiff Berkowitz realleges and incorporates by reference the allegations made in Paragraphs 1 through 108 of this Complaint.

110.    This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

111.    By virtue of the acts described above, the Defendants defrauded the United States by failing to adhere to the Trade Agreements Act clauses.

112.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used, material false statements to obtain Federal Government payment for false or fraudulent claims because the Defendants falsely represented the country of origin of the products that it sold and offered for sale to the United States Government *after June* 7, *2008* in violation of the Trade Agreements Act.

113.    The United States Government relied upon these false statements and has been damaged and continues to be damaged in substantial amounts. The exact amount of the damage is to be determined at trial.

JURY DEMAND

114.    Plaintiffs demand trial by jury on all claims.

PRAYER

115.    WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.      That Defendants be found to have violated and be enjoined from future violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.;*

b.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government and the State of Ulinois has sustained because of defendant's false or fraudulent claims, plus the maximum civil penalty for each violation of the federal False Claims Act, 3 L U.S.C. § 3729 *et seq.;*

c.      That Plaintiffs be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

d.  That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States bas sustained because of Defendants·false or fraudulent claims, plus the maximum civil penalty for each violation of the federal False Claims Act, the federal False Claims Act, 31 U.S.C. §3729 *et seq.:*

e.  That Plaintiffs be awarded all costs of this action, including expert witness fees, attorneys' fees and court costs; and,

f.  That Plaintiffs recover such other relief as the Court deems just and proper.

Dated this 21st day of August. 2014.

Respectfully submitted.

BEHN & WYETZNER, CHARTERED

/s/ Linda Wyetzner
By:  Linda Wyetzner
ly.tetzner'g:behn-wyetzner.com
By:  William W. Thomas
wlhomas  behnw'Vctzner.com
828 Davis Street, Suite 303
Evanston, CL 60201
312.629.0000 (Ph)
224.420.3172 (Fax)