UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JEFFREY BERKOWITZ, and JEFFREY BERKOWITZ, individually<br><br>                    Plaintiffs,<br><br>v.<br><br>AUTOMATION AIDS; A&E OFFICE AND INDUSTRIAL SUPPLY; SUPPORT OF MICROCOMPUTERS ASSOCIATED; APRISA TECHNOLOGY LLC; SUPPLY SAVER CORPORATION; UNITED OFFICE SOLUTIONS, INC.; VEE MODEL MANAGEMENT CONSULTING; CAPRICE ELECTRONICS, INC.; and COMPUTECH DATA SYSTEMS,<br><br>                    Defendants. | **Case No. 13-cv-8185**<br><br>**JUDGE EDMOND E. CHANG**<br><br><br><br>**JURY TRIAL DEMANDED**<br><br><br><br>**FALSE CLAIMS ACT**<br>**THIRD AMENDED COMPLAINT** |

The United States of America *ex rel.* Jeffrey Berkowitz, and Jeffrey Berkowitz, individually ("Plaintiffs"), by and through their attorneys Sanford Heisler LLP and Behn & Wyetzner, Chtd., state as follows for their complaint against: Automation Aids Inc. ("Automation"); A&E Office and Industrial Supply ("A&E"); Support of Microcomputers Associated ("SOMA"); Aprisa Technology LLC ("Aprisa"); Supply Saver Corp. ("Supply Saver"); United Office Solutions, Inc. ("United"); Vee Model Management Consulting ("Vee"); Caprice Electronics, Inc. ("Caprice"); and, Computech Data Systems ("Computech") (collectively "Defendants"):

## I.     INTRODUCTION

1.     The United States of America, through the Relator Jeffrey Berkowitz ("Relator," "Relator Berkowitz," or "Berkowitz"), and Relator seek to recover treble damages and civil penalties arising from false statements and claims made, used, or caused to be made by Defendants to the United States, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729-33, *et seq.*

2.     Defendants are vendors that sell products to the United States Government through the U.S. Government's administrative agency, the General Services Administration ("GSA"). Vendors are required to only sell to the United States Government products that are manufactured in "designated countries"—countries that are recognized under certain international treaties detailed herein. Defendants certified to the United States Government that the products they offer to the U.S. Government were manufactured in designated countries, when those products were in fact manufactured in non-designated countries, including China, Thailand, and the Philippines. In offering and selling products from non-designated countries while certifying that those products were from designated countries, Defendants made material false statements and false claims in violation of the False Claims Act.

3.     The GSA was created in 1949 by President Harry Truman and handles many administrative functions for the United States Government, including purchasing and acquisitions. The GSA website[1] states in a section entitled "Welcome to GSA Schedules" that "GSA establishes long-term government wide contracts with commercial firms to provide access to millions of commercial products and services at volume discount pricing. These can be ordered directly from GSA Schedule contractors or through GSA Advantage's online shopping and ordering system." "GSA Advantage is the online shopping and ordering system that provides

---

[1] Available at: http://www.gsa.gov/portal/category/100615. Last visited March 8, 2016.

access to thousands of contractors and millions of supplies and services. . . . Federal government employees can make purchases on GSA Advantage using . . . a government wide commercial purchase card (GSA Smart Pay)." "State and local governments can now use GSA Advantage to purchase products and services…" In the section entitled "First Steps as a GSA Contractor," it states that "new contractors are required to upload their current pricelist to GSA Advantage, GSA's online shopping and ordering system."[2] GSA Advantage is the federal government's version of Amazon.com.

4.      The GSA maintains and awards Federal Supply Schedule ("FSS") contracts, which are indefinite delivery, indefinite quantity contracts with commercial firms to provide supplies and services to Government agencies throughout the world. The FSS is divided into several "Schedules," each of which is a vehicle to buy and sell a certain type of product.

5.      For example, Schedule 70 is devoted to "General Purpose Commercial Information Technology Equipment, Software, and Services." Vendors that wish to offer information technology ("IT") supplies to the Government through the GSA must apply and obtain a Schedule contract under Schedule 70. Additionally, vendors sell packaging and shipping supplies on Schedule 81, hardware supplies on Schedule 51, janitorial supplies and linens on Schedule 73, building supplies and material handling on Schedule 56, and office supplies and related products on Schedule 75.

6.      The GSA negotiates each vendor Schedule contract and attempts to achieve an agreement that provides the best value for the U.S. Government. The GSA also requires that all of its vendor Schedule contracts comply with U.S. Government regulations, policies, and procurement objectives.

---

[2] http://www.gsa.gov/portal/content/202845. Last visited March 8, 2016.

7.     Compliance with the federal Trade Agreements Act ("TAA") (19 U.S.C. § 2501 *et seq*.) is one of the requirements that all vendors seeking GSA contracts must meet. The GSA website[3] states that the TAA is:

> [T]he enabling statute that implements numerous multilateral and bilateral international trade agreements and other trade initiatives. Since the estimated dollar value of each Schedule exceeds the established Trade Agreements Act (TAA) threshold, the TAA is applicable to all Schedules. *In accordance with the TAA, only U.S. made or designated country end products shall be offered and sold under Schedule contracts.*

(emphasis added) In other words, with very rare exceptions, products sold to the Government through the GSA must have been manufactured either in the U.S. or a "designated country." It is illegal to sell the U.S. Government products on GSA Schedules that were manufactured in a non-designated country.

8.     The U.S. Government maintains a list of designated countries. Under GSA regulations, GSA vendors are not allowed to offer any product covered by the World Trade Organization's Government Procurement Agreement for sale on the FSS Schedule if the product does not originate in a designated country.[4] For example, China and Thailand are two countries that are not designated countries, and accordingly China and Thailand are not included on the list of designated countries.

9.     Defendants in this case are entities that have entered into vendor Schedule contracts with the GSA to provide office supplies, information technology equipment, and other products to the U.S. Government. Therefore, they have certified compliance with applicable laws and regulations, including the TAA.

---

[3] Available at: http://www.gsa.gov/portal/content/200369?utm_source=FAS&utm_medium=print-radio&utm_term=schedules-ordering&utm_campaign=shortcuts, under "Trade Agreements Act Information." Last visited March 8, 2016.

[4] In rare circumstances, a contracting officer can find that an exception applies as defined by the Federal Acquisition Regulations. Such exceptions are not at issue here.

10.     Relator Jeffrey Berkowitz discovered that Defendants have been selling products which are not designated country end products. He found this information as a regular part of his duties as president of a company that sells products and services to Government agencies. Particularly, Relator discovered that Defendants were selling products made in non-designated countries, in violation of GSA regulations, and thus these products were unlawfully sold to the Government.

11.     Relator Berkowitz discovered that Defendants certified these products as having been manufactured in designated countries.

12.     The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., holds liable persons who submit to the United States Government false claims for payment or make material false statements.

13.     Relator Berkowitz seeks to recover damages and civil penalties arising from Defendants' material false statements and presentation of false claims to the United States in connection with the sale of products from non-designated countries in violation of the World Trade Organization-Government Procurement Act, the Trade Agreements Act, GSA contracts and policies, and applicable Federal Acquisition Regulations, including but not limited to "FAR Subpart 25.4 – Trade Agreements."

14.     Relator Berkowitz has direct and independent knowledge that the Defendants are selling products to the United States Government that did not originate in designated countries under the TAA, and are therefore making material false statements and presenting false claims to the United States.

## II.     JURISDICTION AND VENUE

15.     This is a civil action arising under the laws of the United States to redress violations of 31 U.S.C. §§ 3729 *et seq*. This Court has jurisdiction over the subject matter of this

action pursuant to: (i) 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730; (ii) 28 U.S.C. § 1331, which confers federal subject matter jurisdiction; and, (iii) 28 U.S.C. § 1345, because the United States is a plaintiff. The Defendants, by electing to participate in the GSA Schedules and the on-line portal, GSA Advantage, agreed to and did sell and deliver products to government agencies throughout the United States. GSA Advantage is an on-line portal that enables U.S. government employees throughout the country and the world to purchase items from sellers that post goods in accordance with GSA Schedules. GSA maintains a Regional Office in Chicago, Illinois located at 230 S. Dearborn Street to oversee the various activities of the agency.

16.     This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

17.     To the extent that there has been a public disclosure unknown to Relator Berkowitz, Berkowitz is an original source under 31 U.S.C. § 3730(e)(4). He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under the FCA based on the information.

18.     In accordance with the provisions of 31 U.S.C. § 3730(b)(2), Relator Berkowitz has provided to the Attorney General of the United States and to the United States Attorney for the Northern District of Illinois a statement summarizing known material evidence and information related to the Complaint. These disclosure statements are supported by material evidence.

19.     This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a). Many, if not all, of the Defendants can be found, transact business, or performed an act in violation of the False Claims Act in the Northern District of Illinois. Defendants presented false or fraudulent claims to the United States in this District.

20.     Venue is proper in this District under 31 U.S.C. § 3732 (a) and 28 U.S.C. § 1391.

## III.    PARTIES

21.     Relator Berkowitz is a resident of Freeport, New York. At all times relevant herein, he has worked as the President of Complete Packaging and Shipping Supplies, Inc., selling products and services to federal Government agencies. In this capacity, he gained direct and independent knowledge of the allegations contained in this Complaint.

22.     Defendant Automation Aids Inc. has offices at 420 Babylon Rd., Ste. B, Horsham, PA, 19044. Automation Aids has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-14F-1242H through the GSA Advantage on-line portal.[5]

23.     Defendant A&E Office & Industrial Supply has offices at 10302 Park Meadow Dr., Houston, TX 77089-2200. A&E has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract numbers GS-02F-0059Y and GS-35F-0427X through the GSA Advantage on-line portal.[6]

24.     Defendant Support of Microcomputers Associated (d/b/a SOMA Computer) has offices at 1819 JFK Blvd., Ste. 460, Philadelphia, PA 19103. SOMA has sold and continues to

---

[5] *See*
https://www.gsaadvantage.gov/advantage/contractor/contractor_detail.do?mapName=/s/search/&cat=ADV&contractNumber=GS-14F-1242H.
[6] *See*
https://www.gsaadvantage.gov/advantage/contractor/contractor_detail.do?mapName=/s/search/&cat=ADV&contractNumber=GS-35F-0427X.

sell products to the federal Government under GSA contracts including but not limited to contract number GS-02F-0046W through the GSA Advantage on-line portal.[7]

25.     Defendant Aprisa Technology LLC has offices at 24 Lumber Rd., Roslyn, NY 11576. Aprisa has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-35F-0536T through the GSA Advantage on-line portal.[8]

26.     Defendant Supply Saver Corp. has offices at 1324 Wyckoff Rd., Ste. 103, Neptune, NJ 07753. Supply Saver has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-02F-0090N through the GSA Advantage on-line portal.[9]

27.     Defendant United Office Solutions has offices at 16180 Highway 7, Ste. 2, Minnetonka, MN 55345. United Office Solutions has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract numbers GS-02F-0067P through the GSA Advantage on-line portal.[10]

28.     Defendant Vee Model Management Consulting has offices at 520 Central Pkwy. E., Ste. 117, Plano, TX 75074. Vee has sold and continues to sell products to the federal

---

[7] *See* https://www.gsaadvantage.gov/advantage/contractor/contractor_detail.do?mapName=/s/search/&cat=ADV&contractNumber=GS-02F-0046W.

[8] *See* https://www.gsaadvantage.gov/advantage/contractor/contractor_detail.do?mapName=/s/search/&cat=ADV&contractNumber=GS-02F-0182R.

[9] *See* https://www.gsaadvantage.gov/advantage/contractor/contractor_detail.do?mapName=/s/search/&cat=ADV&contractNumber=GS-02F-0090N.

[10] *See* https://www.gsaadvantage.gov/advantage/contractor/contractor_detail.do?mapName=/s/search/&cat=ADV&contractNumber=GS-02F-0067P.

Government under GSA contracts including but not limited to contract number GS-02F-0275P through the GSA Advantage on-line portal.[11]

29.     Defendant Caprice Electronics, Inc. has offices at 63 Flushing Ave., Brooklyn, NY 11205. Caprice Electronics has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract numbers GS-02F-0023X and GS-21f-0083Y through the GSA Advantage on-line portal.[12]

30.     Defendant Computech Data Systems (d/b/a Computech International Inc.) has offices at 525 Northern Blvd., Ste. 102, Great Neck, NY 11021. Computech has sold and continues to sell products to the federal Government under GSA contracts including but not limited to contract number GS-02F-0225X through the GSA Advantage on-line portal.[13]

## IV.    THE FEDERAL FALSE CLAIMS ACT

31.     The FCA, 31 U.S.C. §§ 3729-33, *et seq.*, was originally enacted during the Civil War but substantially amended by the False Claims Amendments Act of 1986, which were signed into law on October 17, 1986. Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the FCA. Congress acted after finding that fraud in federal programs and procurement was, and remains, pervasive, and further finding that the FCA, which Congress

---

[11] *See*
https://www.gsaadvantage.gov/advantage/contractor/contractor_detail.do?mapName=/s/search/&cat=ADV&contractNumber=GS-02F-0275P.

[12] *See*
https://www.gsaadvantage.gov/advantage/contractor/contractor_detail.do?mapName=/s/search/&cat=ADV&contractNumber=GS-02F-0023X.

[13] *See*
https://www.gsaadvantage.gov/advantage/contractor/contractor_detail.do?mapName=/s/search/&cat=ADV&contractNumber=GS-02F-0225X.

characterized as the primary tool for combating fraud in Government contracting, was in need of modernization.

32.     The FCA provides that any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government, as well as attorneys' fees. The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action for himself and on behalf of the Government and to share in any recovery. The complaint is to be filed under seal for sixty days (without service on the defendants during such sixty-day period) to enable the Government to (a) conduct its own investigation without the Defendants' knowledge, and (b) determine whether to join the action.

33.     The FCA was further amended by the Fraud Enforcement Recovery Act ("FERA") passed by Congress and signed into law on May 20, 2009 for the express purpose of strengthening the tools available to combat fraud and to overturn judicial decisions that had weakened the False Claims Act. Pub. L. No. 111-21, 123 Stat. 1617 (2009).

34.     While most of the new provisions apply only to claims after the effective date of the statute, Congress determined that 31 U.S.C. § 3729(a)(1)(B), which revised the former section designated as 31 U.S.C. § 3729(a)(2) pertaining to liability for false statements, "…shall take effect as if enacted on June 7, 2008, and shall apply to all claims…that are pending on or after that date." Section 4(f) of FERA, 123 Stat. at 1625 (*see* note following 31 U.S.C. § 3729).

35.     For claims prior to June 7, 2008, 31 U.S.C. § 3729(a)(2) holds liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." *Id*. (emphasis added.)

10

36.    For claims after June 7, 2008, 31 U.S.C. § 3729(a)(1)(B) holds liable any person who "knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." *Id*. (emphasis added.)

37.    The FCA defines a "claim" as:

    (A)    […] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that –

        (i)    is presented to an officer, employee, or agent of the United States; or

        (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government –

            (I)    provides or has provided any portion of the money or property requested or demanded; or

            (II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

    (B)    does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

31 U.S.C. § 3729 (b)(2).

38.    All U.S. government purchases from Defendants through the GSA of equipment certified by Defendants as originating in a designated country, where that equipment originated in a non-designated country, are "claims" for the purposes of the FCA.

## V.    THE GENERAL SERVICES ADMINISTRATION AND THE FEDERAL SUPPLY SCHEDULE

39.    The GSA is an agency of the Federal Government that handles many administrative functions for the Federal Supply Schedule ("FSS") contracts, which are indefinite

delivery, indefinite quantity contracts with commercial firms to provide supplies and services to Government agencies throughout the world. The FSS is divided into several "Schedules," each of which is a vehicle to buy and sell a certain type of product. *See* FAR Subpart 8.4 – Federal Supply Schedules.[14]

40.     For example, Schedule 70 is devoted to "General Purpose Commercial Information Technology Equipment, Software, and Services." Vendors that wish to offer IT supplies to the Government through the GSA must apply and obtain a Schedule contract under Schedule 70. *See* FAR Subpart 38.1 – Federal Supply Schedule Program. Additionally, vendors sell packaging and shipping supplies on Schedule 81, hardware supplies on Schedule 51, janitorial supplies and linens on Schedule 73, building supplies and material handling on Schedule 56, and office supplies and related products on Schedule 75.

41.     The GSA negotiates each contract and attempts to achieve an agreement that provides the best value for the Government and complies with the United States' policy and procurement objectives. *See* FAR Subpart 8.1 *et seq.* Government contracting officers may purchase products through the GSA Advantage web portal for the use by government agencies throughout the United States and the world and may assume that the product price is fair and reasonable. They can also assume that vendors with Schedule contracts are compliant with all applicable laws and regulations.

## VI.     THE TRADE AGREEMENTS ACT

42.     Under the terms of the FSS Contract, vendors selling products to the federal Government must obey the Trade Agreements Act of 1979, 19 U.S.C. § 2501 *et seq.* ("TAA"). Congress articulated its reasons for passing the TAA at 19 U.S.C. § 2502. One of these reasons is

---

[14] The GSA's procurement functions are largely regulated by what are commonly referred to as the "FAR," or Federal Acquisition Regulations.

the approval and implementation of trade agreements negotiated under the Trade Act of 1974. *Id.* at § 2502(1).

43.     Congress and the President, by virtue of this legislation, endorsed and accepted certain trade agreements and mechanisms to implement these agreements. The covered agreements are listed at 19 U.S.C. § 2503(c).

44.     Subsection (c)(3) applies the Trade Agreements Act to the Agreement on Government Procurement. 19 U.S.C. § 2503(c)(3) (1979).

45.     Under the terms of the World Trade Organization Government Procurement Agreement ("WTO GPA"), signatory countries have agreed to allow industries from WTO member countries to freely participate in certain aspects of government procurement on equal footing with domestic companies.

46.     For example, under this agreement industries based in Great Britain are allowed to freely compete for federal Government contracts in the United States on an equal footing with United States domestic companies. Similarly, companies from the United States can freely compete for contracts issued by Great Britain.

47.     Through the TAA and Federal Acquisition Regulations, the United States has determined that the WTO GPA applies to a number of agencies, including the GSA.

48.     What this means in practical terms is that federal procurement regulations which must be followed by vendors selling products and equipment to the U.S. Government through the GSA and to states like Illinois through the Cooperative Purchasing program, forbid: (a) the sales to certain federal agencies, including the GSA; (b) of certain products, including information technology products; (c) that are from so-called "non-designated countries," except under limited circumstances, not applicable here.

13

49.     "Non-designated countries" are countries with which the United States does not have an official trade agreement under the WTO GPA, and they include China, Malaysia, Thailand, and the Philippines.

50.     The WTO GPA does not apply to all end products from foreign countries. Dollar thresholds, based upon the total dollar value of the procurement, have been established to mark the point at which the WTO GPA restrictions would begin to apply. *See* FAR Subpart 25.402 ("The value of the acquisition is a determining factor in the applicability of trade agreements").

51.     To decide whether eligible products from WTO GPA countries are entitled to non-discriminatory treatment, GSA contracting officers apply sections of the FAR, basing the threshold upon projected sales for the calendar year to establish the threshold. The threshold is adjusted every two years. In 2007, the TAA threshold for WTO GPA products was $193,000. It was raised to $194,000 on January 15, 2009. In 2014 the threshold was $204,000. There is no annual period when any of the Defendants had sales less than $193,000. Therefore the TAA threshold was always met, and the TAA applied to these Defendants at all times.

## VII.    FEDERAL ACQUISITION REGULATIONS REQUIRE VENDORS TO BE COMPLIANT WITH THE TAA

52.     FAR 52.225-5 defines critical terms such as "Designated Country," and specifically identifies the countries that are recognized as such. FAR 52.225-5 (a). The clause also identifies the countries that are not considered to be "designated," by not including them on the list. As China, Malaysia, and the Philippines fall into the latter category, they are not designated countries. FAR 52.225-5 also states that the "designated country end product" means a product produced in one of the listed countries. *Id*.

53.     FAR 52.225-5 states that in most instances, the contractor is prohibited from *delivering* products under the contract that are not US made or from designated countries. FAR

52.225-5 (b). The regulation states: "The Contractor *shall deliver under this contract only US-made or designated country end products* except to the extent that in its offer, it specified the delivery of other end products in the provision entitled "Trade Agreements Certificate." *Id.* (emphasis added).

54.     The Trade Agreements Certificate is FAR 52.225-6, which by the terms of FAR 25.11 (c)(2) is required to be completed each time that FAR 52.225-5 is used. FAR 25.1101 (c)(2). This certificate has two parts, Subsection (a) and Subsection (b). Contractors or vendors executing FAR 52.225-6 (a), "certify that each end product, except those listed in paragraph (b) of this provision, is a U.S.-made or designated country end product as defined in the clause of this solicitation entitled 'Trade Agreements.'" FAR 52.225-6 (a). Under subsection (b), the contractor must list with particularity all of those end products that *are not U.S.-made and/or were not produced in a designated country*.

55.     FAR 52.225-5 should have been a part of each of the Agreements between the United States Government and Defendants and therefore, the FAR 52.225-6 Trade Agreements Certificate was required to be completed by Defendants.

56.     Information about the country of origin of the end product is material to all Government contracting officials, because they do not have the authority to purchase a WTO-GPA end product that is not U.S.-made or from a designated country except under extremely limited circumstances. Moreover, at all times relevant herein, the FAR Clause 52-225-5 has been included in the contracts between the United States and the Defendants, and Defendants have certified compliance as a condition of doing business with the Government.

57.     FAR subpart 25.5 describes the process for contracting officers to use to evaluate foreign goods. FAR 25.502(b) specifically addresses the procedures for a contracting officer to follow when dealing with acquisitions covered by the WTO GPA. FAR 25.502 (b). Contracting

officers must "consider only offers of U.S.-made or designated country end products, unless no offers of such end products were received." FAR 25.502 (b)(1). Once the contracting authority identifies the eligible offers, he or she must give equal consideration to end-products from the U.S. and designated countries and make the award based upon the lowest price. FAR 25.502 (b)(2). Only when there are no offers of U.S.-made or designated country made end products, can the contracting officer then buy products from a non-designated country. FAR 25.502 (b)(3).

58.     Read together, FAR 52.225-5(b) and FAR 25.502 (b) severely reduce the likelihood of any foreign product from a non-designated country reaching a federal facility. If the vendor does not list the foreign item as originating in a non-designated country pursuant to FAR 52.225-5 (b) and FAR 52-225-6 (b), the vendor cannot "deliver" the product to the Government. The use of the world "deliver" means that even if a contracting officer mistakenly purchases such an item, the vendor has an independent obligation *not* to deliver it, if the vendor failed to properly identify the product and its country of origin under FAR 52.225-5 (b) and FAR 52-225-6(b).

59.     A contracting officer can only buy the end product from a non-designated country if there are *no* available products from the     U.S. or a designated country. FAR 25.502 (b)(2).

60.     Therefore, it is illegal for vendors to sell IT products that were manufactured in a non-designated country, including but not limited to those manufactured in China, unless there are no products available on the relevant GSA Schedule from the U.S. or a designated country.

61.     The GSA specifically notifies all vendors and potential Government customers that the TAA applies to all products and contracts awards under the FSS. The GSA website[15] states: "The Trade Agreements Act (19 U.S.C. § 2501 *et seq.*) is the enabling statute that

---

[15] Available at http://www.gsa.gov/portal/content/200369?utm_source=FAS&utm_medium=print-radio&utm_term=schedules-ordering&utm_campaign=shortcuts, under "Trade Agreements Act Information." Last visited March 8, 2016.

implements numerous multilateral and bilateral international trade agreements and other trade initiatives. Since the estimated dollar value of each Schedule exceeds the established Trade Agreements Act (TAA) threshold the TAA is applicable to all Schedules. In accordance with the TAA, only U.S.-made or designated country end products shall be offered and sold under Schedule contracts."

62.     Under GSA procurement policies, vendors are not allowed to offer a product covered by the WTO GPA for sale on the FSS Schedule that does not originate in a designated country.[16]

63.     The GSA has consistently advised vendors of the need to comply with the Trade Agreements Act. In "GSA Steps," a newsletter published by the GSA and disseminated to vendors, the GSA commented in Issue No. 10, March 2006, at page 2:

> As a reminder, in solicitation provision FAR 52.212-3 (f)(2), Offeror Representations and Certifications-Commercial Items, you must include a comprehensive list of those offered items that are obtained from sources other than the U.S. or designated country. In this same paragraph, your firm certifies to the accuracy of that representation. Any item not identified as from other than a designated country is considered to be compliant with the Trade Agreement clause of the contract.
>
> We urge you to review the products offered under your contract to ensure your company is compliant with the TAA requirements. You need to know where your contract products are produced or "substantially transformed" and compare that information to the countries listed in the various multilateral and bilateral international trade agreements and other trade initiatives as implemented by the Trade Agreements Act. If problems exist, we will work with you to address compliance issues; however, be aware that the contractor is ultimately responsible for compliance with the Trade Agreements act in accordance with clause 52.225-5 Trade Agreements. As a reminder, in solicitation provision FAR 52.212-3 (f)(2), Offeror Representations and Certifications-Commercial Items, you must include a comprehensive list of those offered items that are obtained from sources other than the U.S. or designated country. In this same paragraph, your firm certifies to the accuracy of that representation. Any item not identified as from other than a

---

[16] In rare circumstances, a contracting officer can find that an exception applies as defined by the FAR. Such exceptions are not at issue here.

designated country is considered to be compliant with the Trade Agreement clause of the contract.

64.     Prior to that in an earlier issue of "GSA Steps" (Issue No. 8, September 2005), the GSA stated:

> Incorporated in [all] GSA Multiple Award Schedule contracts is FAR Clause 52.225-5, Trade Agreements. This clause is included in contract clause 52.212-3, Offeror Representations and Certifications-Commercial Items. When you signed your contract, you certified that all end products offered on your contract comply with the terms of the FAR 25.4, Trade Agreements. This applies to all of the products on your contract, whether you have one product or 10,000. The Trade Agreements Act applies to services, too.

65.     The September 2005 issue of "GSA Steps" also explained how GSA vendors should collect information from manufacturers about the country of origin. GSA advised vendors to keep a database to track the source of each product. In addition, if a vendor discovered a product from a non-designated country during a review or audit, GSA urged the vendors to "immediately notify your Procuring Contracting Officer (PCO) and request a modification to remove those products from your contract."

66.     The September 2005 GSA Steps warned vendors of potential TAA liability:

> Perhaps you [a contractor] saw the media coverage in late May about a major office products retailer reaching a $9.8 million settlement with U.S. Department of Justice over violations of U.S. trade regulations. Perhaps that slipped under your radar or you did not think about that issue and how it related to your GSA Multiple Award Schedule contract. If so, think again.

67.     "FAR Subpart 25.5 – Evaluating Foreign Offers – Supply Contracts" makes it plain that the presence of a product from a non-designated country on a purchase order or invoice submitted by a contractor mandates that the Contracting Officer must "reject" the offer and seek

other compliant offers. FAR 25.501 states that a contracting officer must analyze each "line item [17] of an offer unless the offer or solicitation specifies evaluation on a group basis."

68.     Section 25.501 (a) states that the contracting officer then must "identify and *reject* offers of end products that are prohibited…." Section 25.501 (c) (emphasis added). Even if the solicitation or offer calls for a Group Offer, an offer based upon a group of line items, the contracting officer must "*reject* the offer…if the acquisition is covered by the WTO GPA and *any part of the offer* consists of items restricted in accordance with 22.403(c)." (emphasis added).

69.     That these regulations require the rejection of the entire offer as opposed to the non-compliant product in the offer underscores the harm to the government caused as a matter of policy when a contractor fills an order with products from non-designated countries, and fails to disclose this fact to the contracting officer who is permitted to assume that the vendor is acting in accordance with the contract specifications and only delivering products that originated in the U.S. or designated countries. As indicated in FAR 25.501(b), the contracting officer is permitted by law to rely on the "offeror's certification of end product origin when evaluating a foreign offer."

70.     Only if no suitable compliant offers are received, does the contracting officer then have the authority to make a non-availability finding and accept an offer that includes these products. When no compliant offers are received, then the contracting officer must "make a non-availability determination…and award to the lowest bidder." FAR 25.502 (b) (3). *See also*, *Integrated Technologies*, GAO Decision, B-295958 (May 13, 2005).

---

[17]  FAR Subpart 4.10 defines line items: "Contracts may identify the items or services to be acquired as separately identified line items."

71.     The products in question were all listed separately and identified on the invoice and purchase orders on separate line items. As such, pursuant to FAR 25.5, these items are subject to the "line item" analysis. If the defendants had identified the products country of origin as being a non-designated country, like China, then the contracting officer would have been required to halt the process and follow the procedures outlined above to either reject the order or conduct a non-availability analysis.

72.     By failing to advise the contracting officer that the products originated in a non-designated country, the defendants made a material misstatement in violation of an express certification, that allowed them to sell not just non-compliant products, but entire orders that would have been rejected but for the intentional misrepresentation.

73.     "FAR 52.225-5 Trade Agreements" Clause, subsection (b) limits the types of products that can be "delivered" in satisfaction of the contract. That is, to satisfy this contract contractors may only "deliver" products that originated in the U.S. or a designated country. Conversely, they may not deliver products from non-designated countries unless they specifically list and identify these non-compliant products and their country of origins. The Trade Agreement Certificate effectuates this purpose expressly and none of the Defendants identified the non-compliant products and their country of origins prior to the sale. If they had, then according to FAR the entire offer including the non-compliant products would have been rejected or subject to a non-availability analysis.

74.     None of the Defendants identified the non-compliant products and their country of origins prior to the sale. If they had, then according to FAR the entire offer including the non-compliant products would have been rejected or subject to a non-availability analysis.

75.     The Contracting Officer's clear and unequivocal *duty to reject* offers that include non-compliant products, FAR 25.501(c), and the vendor's contractual *duty not to deliver* non-

conforming products, FAR 52.225-5 (b), emphasize the United States Government's policy, as expressed through the FAR, not to expend any federal dollars on products from non-designated countries except in very limited circumstances, that do not exists in the case at bar.

76.    Adherence to FAR 52.225-5 Trade Agreements and FAR 52.225-6 Trade Agreements Certificate is not just an express condition of payment but a condition precedent to the formation of the contract regarding the contractor offer that purports to satisfy a Federal Supply Service order with products from non-designated countries.

77.    This policy, the rejection of entire orders that include products from non-designated countries, is not only reflected by the unambiguous language in the regulations, but also in the decisions by the Government Accounting Office that routinely set aside entire orders that impermissibly include products from non-designated countries in violation of the Trade Agreements Clause and Certificate. *See*, *Integrated Technologies*, GAO Decision, B-295958 (May 13, 2005.)

### A.    LIMITED EXCEPTIONS TO THE PROHIBITIONS AGAINST PROCUREMENT OF PRODUCTS FROM NON-DESIGNATED COUNTRIES

   ***i.    So-called Open Market Purchases May Be Made Under a GSA-FSS Contract But May Not Exceed the Micro-Purchase Limit.***

78.    The Government is allowed to purchase a limited quantity of items that are not on the vendors GSA FSS contract list so long as all the requirements of FAR 8.402 are met. Items that are not on a contractor's Federal Supply Schedule are known as "open market" items. *See*, FAR 8.402(f) ("For administrative convenience, an ordering activity contracting officer may add items not on the Federal Supply Schedule (also referred to as open market items) to a Federal Supply Schedule blanket purchase agreement (BPA) or an individual task or delivery order…").

21

79.     Open market items are by definition "not on the Federal Supply Schedule" but these items can be purchased "only if" the requirements of FAR 8.402(f) are satisfied.

80.     FAR 8.402 (f)(1) mandates that Open Market sales must adhere to "[a]ll applicable acquisition regulations to the purchase of the items not on the Federal Supply Schedule…[such as]…publicizing (Part 5), competition requirements (Part 6), acquisition of commercial items (Part 12), contracting methods (Parts 13, 14, and 15) and small business program (Part19)."

81.     FAR Part 12 through 15 and 19 all require either publication or competition between more than one vendor.

82.     The only regulation that permits a purchase without publication or competition is FAR 8.405-1(b) ("Ordering activities may place orders at, or below, the micro-purchase threshold with any Federal Supply Schedule contractor that can meet the agency's needs.) FAR 2.101 defines the micro-purchase limit and it has ranged between $2,500 and $3,500.00 for the relevant time period.

83.     The General Services Administration Manual (hereinafter GSAM) spells this out clearly at Sections 513.370-1 and 513.370-2. These two regulations allow the Government to obtain supplies and services on the open market but, "the amount of any one purchase must not exceed the micro-purchase threshold."

84.     Without publication or competition, in compliance with FAR 8.402(f)(1), an agency could offer and contractor could sell up to the micro-purchase limit per invoice, BPA, or Purchase Order, assuming that the other provisions of Far 8.402(f) were met.

85.     FAR 8.402(f) subsections 2 through 4 require that the contracting officer must have determined that the price of the open market goods is fair and reasonable, the items must be

clearly marked as Open Market on the order; and that all other "clauses applicable to items not on the Federal Supply Schedule are included in the order."

86. The GSA Training Manual entitled "GSA Schedule vs. Open Market" (Exhibit A) confirms that Open Market items at or below the micro purchase limit may be easily procured from any FSS vendor. When the order is at or below the micro-purchase limit, the contracting officer "may place the order directly with the selected vendor. FAR procedures for acquisitions at or below the micro purchase threshold emphasize simplicity and fair treatment. Supporting documentation, including extensive information, collection, and evaluation, is not required." *Id*. at page 13.

87. GSA issued a memo dated September 17, 2015 entitled "Multiple Award Schedule 23V Ordering Instructions" that affirmed this, stating:

> **The contractor should only be quoting products that are approved under their GSA contract.** If there are options that are not covered by the contract, the contractor is responsible for stating these items are "open market" and listing them as separate line items. **Note that orders may not be placed against a GSA schedule if the cumulative value of the open market items exceeds the micro-purchase threshold ($3,500).** See FAR 8.402(f). Should the items not be available under GSA contract, then GSA will reject the order. To ensure that the order is not rejected, please verify that all items are available under contract prior to submitting the request.

> Exhibit B (emphasis in original).

88. The GSA PowerPoint Presentation entitled "An Advanced Overview of Multiple Awards Schedule Contracts" (Exhibit C) is located at the Vendor Support Center for GSA Advantage. In this presentation, it gives this advice to vendors at slide 15 in the notes:

> You should ensure that you clearly declare to any ordering activity at all times during the procurement process which items are available on your approved pricelist and which items/services are not (open market). If you have questions as to whether or not an order includes products and services that are outside the scope of your contract, contact your PCO before accepting the order.

89. The GSA PowerPoint Presentation entitled "Ensuring an Exceptional Multiple Award Schedule Report Card" (Exhibit D) is located at the Vendor Support Center for GSA Advantage. In this presentation it gives this advice to vendors at Slide 13 in the notes:

> Let's start with scope of your contract. You are only allowed to sell products and services that fall within the Special Item Number (SIN) descriptions and the Scope of Work outlined in your Schedule contract. Therefore, it is important that non-contract items are identified, as such, on all orders.

> Do not purposely or inadvertently represent non-contract items as being Schedule contract items. Non-contract items should be procured using open market procedures. For that reason, you are doing a disservice to your federal customers when you violate the scope of your Multiple Award Schedule (MAS) contract because critical procurement requirements are not being satisfied.

### ii.     *Open Market Sales Above the Micro-Purchase Threshold Require Competition and/or Publication.*

90. Purchases of Open market items between the micro purchase threshold and the Simplified Acquisition Threshold ($150,000) require the use of FAR Part 12 and 13. Under these circumstances, the contracting officer can survey and consider the products and prices from at least three schedule holders to determine the best value for the agency. *Id*. at page 13.

91. Purchases of Open market items that exceed the Simplified Acquisition Threshold of $150,000 trigger the application of FAR Part 14 and 15 and competitive and /or sealed bidding regulations.

92. Under GSA Guideline, including FAR 8.405-2, the agency must issue a Request for Quotation (RFQ) that includes the evaluation criteria and post the RFQ on eBuy for Schedule contractors when the products or services sought are not on the Schedule and exceed the Simplified Acquisition Threshold. *See*, http://www.gsa.gov/MASDESKTOP/section7_4.html.

93. For orders that exceed the micro purchase limit but do not exceed the simplified acquisition threshold, GSA recommends that contract officers must first determine if the product

or service is available on GSA Advantage, then review quotations from at least three GSA vendors and make a "Best Value" determination. *See*, http://www.gsa.gov/portal/content/199145.

94.     For orders of products that exceed the simplified acquisition threshold, GSA requires an RFQ be posted on eBuy that affords "all Schedule contractors the opportunity to respond, or provide the RFQ to as many Schedule Holders as practicable, consistent with market research to ensure that at least three quotes are received from at least three contractors." http://www.gsa.gov/portal/content/199145.

95.     Adherence to the GSA Open Market procedures is not just a condition of payment but it is a condition precedent to acceptance of the contract offer that includes Open Market violations. The Government Accounting Office has routinely rejected offers that violated the Open Market procedures. *See*, *CourtSmart Digital Systems, Inc*., B-292995.2; B-292995.3 (February 13, 2004).[18]

## VIII.   RELATOR DISCOVERS DEFENDANTS' FRAUD

96.     Relator Berkowitz is the President of Complete Packaging and Shipping Supplies, Inc. ("Complete Packaging") which is located at 83 Bennington Avenue, Freeport, New York 11520. Complete Packaging sells a variety of products such as office supplies, packaging and shipping supplies, hardware and tools, information technology products, and janitorial and maintenance supplies to many Government departments and agencies throughout the United States.

---

[18] "The FSS program, directed and managed by the General Services Administration (GSA), gives federal agencies a simplified process for obtaining commonly used commercial supplies and services. FAR Sec. 8.401(a). Orders placed using the procedures established for the FSS program satisfy the statutory and regulatory requirement for full and open competition. FAR Secs. 6.102(d)(3), 8.404(a). Non-FSS products and services may not be purchased using FSS procedures; instead, their purchase requires compliance with the applicable procurement laws and regulations, including those requiring the use of competitive procedures. *Symplicity Corp.*, B-291902, Apr. 29, 2003, 2003 CPD Para. 89 at 4; see ATA Def. Indus., Inc. v. United States, 38 Fed. Cl. 489, 504 (1997). Therefore, where, as here, an agency solicits quotations from vendors for purchase from the FSS, the issuance of a purchase order to a vendor whose quotation includes a non-FSS item priced above the micro-purchase threshold is improper. *Symplicity Corp.*, *supra*, at 4-5; T-L-C Sys., B-285687.2, Sept. 29, 2000, 2000 CPD Para. 166 at 4."

97.      Relator created Complete Packaging in 1990 and immediately began serving as its President. As a regular part of his duties, Relator Berkowitz sells his services and products through GSA contracts to Government departments and agencies through GSA Advantage, Blanket Purchase Agreements, FedBid, Multiple Award Schedules, Federal Business Opportunities, and other Government sales portals.

98.      In or around 2005, Relator Berkowitz became aware that non-compliant products were being offered for sale to the Government by several vendors. He noticed that various vendors on GSA Advantage were selling items that were not from TAA compliant countries.

99.      While operating Complete Packaging, Relator Berkowitz received product lists that identified the country of origin for various products. As he assembled and sold products to government customers, Relator Berkowitz carefully screened the non-compliant products, but discovered that many vendors with government contracts were not abiding by the requirements of the TAA.

100.      Relator Berkowitz collected data regarding products sold by the Defendants and discovered that hundreds of non-compliant products were in fact being sold to the United States Government in violation of the TAA and the express certifications required by GSA Advantage.

101.      As part of his investigation into this matter, Berkowitz created reports that compared products that were not TAA compliant with sales that were made on GSA Advantage. Despite the fact that vendors listing on GSA Advantage must only offer and sell TAA compliant products, many of the sales included non-compliant products. Comparing the sales data with the country of origin charts in his possession, Relator Berkowitz found that Defendants were selling products to the United States Government that did not originate in a designated country.

102.      By selling products to the United States Government that did not originate in designated countries under the TAA, Defendants made material false statements and presented

26

false claims to the U.S. Government for payment. Relator Berkowitz has direct and independent knowledge of these facts.

## IX.    DEFENDANTS PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NON-DESIGNATED COUNTRIES WHEN DEFENDANTS EXPRESSLY CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES

103.    Defendants knowingly sold products from non-designated countries to the U.S. Government, while falsely certifying they were from designated countries. Defendants then presented false claims for the payment for the sale of these items. The Government paid for the non-compliant products and sustained damages because of Defendants' actions.

104.    Because Defendants did not properly or truthfully complete the Trade Agreements Certificate at FAR 52.225-6 specifying products from non-designated countries that it intended to offer under the contract, Defendants were contractually bound to offer only products from designated countries. FAR 52.225-5 states: "The Contractor shall deliver under this contract only U.S.-made or designated end products except to the extent that, in its offer, it specified delivery of other end products in the provision entitled 'Trade Agreements Certificate.'" By offering and selling products from non-designated countries in the face of misrepresentations and omissions in their Trade Agreements Certificates, Defendants knowingly violated the False Claims Act.

105.    Defendants knowingly or with gross disregard sold products from non-designated countries to the Government and presented false claims for the payment for the sale of these items.

### A.    DEFENDANT AUTOMATION AIDS PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NON-DESIGNATED COUNTRIES WHEN DEFENDANT CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES

106.    Relator Berkowitz gathered information showing that Defendant Automation Aids sold at least 19,697 non-compliant products between April 1, 2010 and June 2013, worth a total

of $1,015,448. Exhibit E to the Complaint lists these 19,697 representative sales. Relator further identified an additional $60,214 worth of non-compliant sales extending into February 19, 2014. These sales are representative of non-compliant sales by Automation Aids to the Government and reflect Defendant Automation Aids' systemic disregard of the TAA and the FCA.

107.    Defendant Automation Aids controls additional data and documentation regarding government sales of non-compliant products.

108.    During this time, Defendant Automation Aids received multiple general notifications from Michelle Williams, GSA TAA Coordinator, Region 2, New York, instructing the company to remove non-TAA compliant products from its GSA product list. On April 19, 2010, Ms. Williams wrote: "In addition, conduct a self-assessment of the current processes, procedures and/or systems that you have in place to monitor the country of origin for all products offered under your schedule." (Exhibit F)

109.    On May 5, 2010, GSA sent another general notice to Defendant Automation Aids instructing the company to remove a non-TAA compliant product from its GSA list of products. (Exhibit G)

110.    On October 15, 2010, GSA again sent a general notice to Defendant Automation Aids stating: "It is strongly advised that your company be proactive in having a process in place to review your MAS contract for compliant TAA products on a regular basis instead of waiting to receive a letter of noncompliance from our office." (Exhibit H)

111.    By virtue of the acts described above, Defendant Automation Aids violated 31 U.S.C. §§ 3729 *et seq.* and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

**B.**     **DEFENDANT A&E PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NON-DESIGNATED COUNTRIES WHEN DEFENDANT CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES**

112.     Relator Berkowitz gathered information showing that Defendant A&E sold at least 16,751 non-compliant products between April 1, 2010 and June 2013, worth a total of $590,645. Exhibit I to the Complaint lists these 16,751 representative sales. Relator further identified an additional $1,378,808 worth of non-compliant sales extending into September 30, 2015. These sales are representative of non-compliant sales by A&E to the Government and reflect Defendant A&E's systemic disregard of the TAA and the FCA.

113.     Defendant controls additional data and documentation regarding government sales of non-compliant products.

114.     Defendant A&E's government sales include transactions with government agencies located in the Northern District of Illinois, such as:

- The Northern District of Illinois office of the Department of Justice;

- The Chicago office for the Centers for Medicare and Medicaid Services; and,

- The Chicago office for the Securities and Exchange Commission.

115.     By virtue of the acts described above, Defendant A&E violated 31 U.S.C. §§ 3729 *et seq*. and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

**C.**     **DEFENDANT SOMA PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NON-DESIGNATED COUNTRIES WHEN DEFENDANT CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES**

116.     Relator Berkowitz gathered information showing that Defendant SOMA sold at least 15,525 non-compliant products between April 1, 2010 and June 2013, worth a total of

$1,333,343. Exhibit J to the Complaint lists these 15,525 representative sales. Relator further identified an additional $2,754,099 worth of non-compliant sales extending from August 4, 2009 through October 6, 2015. Most of these sales were of items manufactured in China. These sales are representative of non-compliant sales by SOMA to the Government and reflect Defendant SOMA's systemic disregard of the TAA and the FCA.

117.    Defendant controls additional data and documentation regarding government sales of non-compliant products.

118.    Defendant SOMA's government sales include transactions with government agencies located in the Northern District of Illinois, such as:

- The Chicago office of the Department of Labor;

- The Chicago office of the Environmental Protection Agency; and,

- The Chicago office of the Social Security Administration.

119.    By virtue of the acts described above, Defendant SOMA violated 31 U.S.C. §§ 3729 *et seq*. and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

### D.    DEFENDANT APRISA PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NON-DESIGNATED COUNTRIES WHEN DEFENDANT CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES

120.    Relator Berkowitz gathered information showing that Defendant Aprisa sold at least 18,431 non-compliant products between April 1, 2010 and June 2013, worth a total of $537,622. Exhibit K to the Complaint lists these 18,431 representative sales. Relator identified additional non-compliant sales extending from August 23, 2007 through December 30, 2014. These sales are representative of non-compliant sales by Aprisa to the Government and reflect Defendant Aprisa's systemic disregard of the TAA and the FCA.

121. Defendant controls additional data and documentation regarding government sales of non-compliant products.

122. During this time, Defendant Aprisa received general notifications from Michelle Williams, GSA TAA Coordinator, Region 2, New York, instructing the company to remove non-TAA compliant products from Aprisa's GSA product list. On September 14, 2012, GSA sent Defendant Aprisa a notification stating: "Please understand that compliance with the Trade Agreement Act is a serious issue. The Department of Justice has been proactive in conducting investigations, and a number of settlements have already been reached under the *qui tam* provision of the False Claims Act." (Exhibit L, emphasis in original). Ms. Williams specifically requested that a Chinese-made product (part number: BRTFAX4100E) manufactured by Brother, be deleted from the GSA product list. Ms. Williams emphasized: "[c]arefully review your complete GSA Advantage! File to ensure that the country of origin is correct for all other products . . . . If you discover any additional noncompliant products now, or throughout the year, please submit a separate Modification request to your Contract Specialist to remove these items from your contract." (*Id*., emphasis in original).

123. By virtue of the acts described above, Defendant Aprisa violated 31 U.S.C. §§ 3729 *et seq*. and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

**E. DEFENDANT SUPPLY SAVER PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NON-DESIGNATED COUNTRIES WHEN DEFENDANT CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES**

124. Relator Berkowitz gathered information showing that Defendant Supply Saver sold at least 5,087 non-compliant products between April 1, 2010 and June 2013, worth a total of $922,843. Exhibit M to the Complaint lists these 5,087 representative sales. Relator further

identified an additional $6,620,911 worth of non-compliant sales extending from January 5, 2010 through March 31, 2015. These sales are representative of non-compliant sales by Supply Saver to the Government and reflect Defendant Supply Saver's systemic disregard of the TAA and the FCA.

125.    Defendant controls additional data and documentation regarding government sales of non-compliant products.

126.    By virtue of the acts described above, Defendant Supply Saver violated 31 U.S.C. §§ 3729 *et seq*. and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

## F.    DEFENDANT UNITED PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NON-DESIGNATED COUNTRIES WHEN DEFENDANT CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES

127.    Relator Berkowitz gathered information showing that Defendant United sold at least 12,216 non-compliant products between April 1, 2010 and June 2013, worth a total of $597,971. Exhibit N to the Complaint lists these 12,216 representative sales. These sales are representative of further non-compliant sales by United to the Government and reflect Defendant's systemic disregard of the TAA and the FCA.

128.    Defendant controls additional data and documentation regarding government sales of non-compliant products.

129.    By virtue of the acts described above, Defendant United violated 31 U.S.C. §§ 3729 *et seq*. and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

**G.    DEFENDANT VEE PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NON-DESIGNATED COUNTRIES WHEN DEFENDANT CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES**

130.    Relator Berkowitz gathered information showing that Defendant Vee sold at least 1,743 non-compliant products between April 1, 2010 and June 2013, worth a total of $381,935. Exhibit O to the Complaint lists these 1,743 representative sales. Relator further identified an additional $1,672,513 worth of non-compliant sales extending through April 1, 2015. These sales are representative of non-compliant sales by Vee to the Government and reflect Defendant Vee's systemic disregard of the TAA and the FCA.

131.    Defendant controls additional data and documentation regarding government sales of non-compliant products.

132.    By virtue of the acts described above, Defendant Vee violated 31 U.S.C. §§ 3729 *et seq.* and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

**H.    DEFENDANT CAPRICE PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NON-DESIGNATED COUNTRIES WHEN DEFENDANT CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES**

133.    Relator Berkowitz gathered information showing that Defendant Caprice sold at least 39,621 non-compliant products between July 1, 2013 and October 31, 2014, worth a total of $687,047. Exhibit P to the Complaint lists these 39,621 representative sales. Relator further identified an additional $1,364,189 worth of non-compliant sales extending from January 1, 2014 through December 31, 2015. These sales are representative of non-compliant sales by Caprice to the Government and reflect Defendant Caprice's systemic disregard of the TAA and the FCA.

134.    Defendant controls additional data and documentation regarding government sales of non-compliant products.

135.    Defendant Caprice's government sales include transactions with government agencies located in the Northern District of Illinois, such as:

- The Chicago District of the Equal Employment Opportunity Commission;

- The Chicago office of the Immigration and Customs Enforcement; and,

- The Northern District office for the Department of Justice.

136.    By virtue of the acts described above, Defendant Caprice violated 31 U.S.C. §§ 3729 *et seq*. and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

## I.    DEFENDANT COMPUTECH PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT CAME FROM NON-DESIGNATED COUNTRIES WHEN DEFENDANT CERTIFIED THEY WERE FROM DESIGNATED COUNTRIES

137.    Relator Berkowitz gathered information showing that Defendant Computech sold at least 7,987 non-compliant products between July 1, 2013 and October 29, 2014, worth a total of $603,668. Exhibit Q to the Complaint lists these 7,987 representative sales. Relator further identified an additional $747,428 worth of non-compliant sales extending from January 1, 2009. Most of these sales were of items manufactured in China. These sales are representative of non-compliant sales by Computech to the Government and reflect Defendant Computech's systemic disregard of the TAA and the FCA.

138.    Defendant controls additional data and documentation regarding government sales of non-compliant products.

139.    Defendant Computech's government sales include transactions with government agencies located in Illinois, such as:

- The Illinois Department of Agriculture; and,

- The Illinois Bureau of Prisons.

140. By virtue of the acts described above, Defendant Computech violated 31 U.S.C. §§ 3729 *et seq*. and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

## X. DEFENDANTS PRESENTED FALSE CLAIMS BY SELLING PRODUCTS TO THE U.S. GOVERNMENT THAT WERE NOT ON THEIR GSA PRICE LIST IN VIOLATION OF THE GSA FSS OPEN MARKET PROCEDURES

141. Open Market items are items that are not listed on a GSA FSS vendors price list and therefore may only be offered for sale in accordance with the GSA FSS Open Market procedures.

142. By definition all products from non-designated countries are Open Market products because vendors are not permitted to list such items on their price list.

143. Open Market items can only be sold in accordance with specific procedures. By virtue of GSAM 513.370-1 and 513.370-2, Open Market product sales are limited to the micro purchase limit per invoice or purchase order.

144. By virtue of FAR 8.402, GSA FSS vendors are required to clearly mark Open Market items on the offer sheet prior to the sale.

145. To the extent that Defendants did not clearly mark Open Market items on their invoices, offer sheets, or purchase orders before the sale, Defendants violated the Open Market procedures and committed a material misstatement by omission. Further investigation and review of the actual invoices in the possession and control of the Defendants will be required to determine the extent of these violations.

146. To the extent that Defendants sold Open Market items to the Government in quantities that exceeded the micro purchase limit, Defendants violated material terms and conditions of their contract and the express requirements of the GSA procedures and the FAR regulations.

147. Defendant Automation Aids knowingly presented false claims to the United States Government when it knowingly submitted claims in connection with several invoices where Open Market products from non-designated countries (NDCs) exceeded the micro purchase threshold. The chart at Exhibit R lists the known violations by invoice number and the amount of NDC sales which exceed the micro purchase limit. Further investigation will reveal more violations.

148. Defendant A&E Office Supply knowingly presented false claims to the United States Government when it knowingly submitted claims in connection with several invoices where Open Market products from non-designated countries exceeded the micro purchase threshold. The chart at Exhibit S lists the known violations by invoice number and the amount of NDC sales which exceed the micro purchase limit. Further investigation will reveal more violations.

149. Defendant SOMA knowingly presented false claims to the United States Government when it knowingly submitted claims in connection with several invoices where Open Market products from non-designated countries exceeded the micro purchase threshold. The chart at Exhibit T lists the known violations by invoice number and the amount of NDC sales which exceed the micro purchase limit. Further investigation will reveal more violations.

150. Defendant Aprisa knowingly presented false claims to the United States Government when it knowingly submitted claims in connection with several invoices where Open Market products from non-designated countries exceeded the micro purchase threshold. The chart at Exhibit U lists the known violations by invoice number and the amount of NDC sales which exceed the micro purchase limit. Further investigation will reveal more violations.

151. Defendant Vee knowingly presented false claims to the United States Government when it knowingly submitted claims in connection with several invoices where Open Market

products from non-designated countries exceeded the micro purchase threshold. The chart at Exhibit V lists the known violations by invoice number and the amount of NDC sales which exceed the micro purchase limit. Further investigation will reveal more violations.

152.   Defendant Caprice knowingly presented false claims to the United States Government when it knowingly submitted claims in connection with several invoices where Open Market products from non-designated countries exceeded the micro purchase threshold. The chart at Exhibit W lists the known violations by invoice number and the amount of NDC sales which exceed the micro purchase limit. Further investigation will reveal more violations.

153.   Defendant Computech knowingly presented false claims to the United States Government when it knowingly submitted claims in connection with several invoices where Open Market products from non-designated countries exceeded the micro purchase threshold. The chart at Exhibit X lists the known violations by invoice number and the amount of NDC sales which exceed the micro purchase limit. Further investigation will reveal more violations.

### COUNT I
*(False Claims Act, 31 U.S.C. § 3729(a)(1))*

154.   Plaintiffs allege and incorporate by reference the allegations made in paragraphs 1 through 153 of this Complaint.

155.   This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729(a)(1).

156.   By virtue of the acts described above, the Defendants knowingly submitted, and caused to be submitted, false or fraudulent claims for payment and reimbursement by the United States Government *before May 20, 2009*, and the United States, unaware of the falsity of the records, statements and/or claims made by the Defendants and in reliance on the accuracy thereof, paid for aforementioned false claims because the Defendants intentionally or with gross

disregard for the truth sold products to the Government that did not originate in the United States or a designated country.

157.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. §§ 3729 *et seq.* and have thereby damaged and continue to damage the United States Government by its actions in an amount to be determined at trial.

## COUNT II
### *(False Claims Act, 31 U.S.C. § 3729(a)(1)(A))*

158.    Plaintiffs allege and incorporate by reference the allegations made in paragraphs 1 through 153 of this Complaint.

159.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

160.    By virtue of the acts described above, the Defendants knowingly submitted, and caused to be submitted, false or fraudulent claims for payment and reimbursement by the United States Government *after May 20, 2009*, and the United States, unaware of the falsity of the records, statements and/or claims made by the Defendants and in reliance on the accuracy thereof, paid for aforementioned false claims because the Defendants intentionally or with gross disregard for the truth sold products to the Government that did not originate in the United States or a designated country.

161.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. §§ 3729 *et seq.* and have thereby damaged and continue to damage the United States Government by its actions in an amount to be determined at trial.

## COUNT III
### *(False Claims Act, 31 U.S.C. § 3729(a)(2))*

162.    Plaintiffs allege and incorporate by reference the allegations made in Paragraphs 1 through 153 of this Complaint.

163.    This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. § 3729(a)(2).

164.    By virtue of the acts described above, the Defendants defrauded the United States by failing to adhere to the Trade Agreements Act clauses.

165.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used, material false statements to obtain Federal Government payment for false or fraudulent claims because the Defendants falsely represented the country of origin of the products that it sold and offered for sale to the United States Government *before June 7, 2008* in violation of the Trade Agreements Act.

166.    The United States Government relied upon these statements and has been damaged and continues to be damaged in substantial amounts. The exact amount of the damage is to be determined at trial.

## COUNT IV
### *(False Claims Act, 31 U.S.C. § 3729 (a)(1)(B))*

167.    Plaintiffs allege and incorporate by reference the allegations made in Paragraphs 1 through 153 of this Complaint.

168.    This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

169.    By virtue of the acts described above, the Defendants defrauded the United States by failing to adhere to the Trade Agreements Act clauses.

170.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used, material false statements to obtain Federal Government payment for false or fraudulent claims because the Defendants falsely represented the country of origin of the

products that it sold and offered for sale to the United States Government *after June 7, 2008* in violation of the Trade Agreements Act.

171.    The United States Government relied upon these false statements and has been damaged and continues to be damaged in substantial amounts. The exact amount of the damage is to be determined at trial.

## JURY DEMAND

172.    Plaintiffs demand trial by jury on all claims.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.    That Defendants be found to have violated and be enjoined from future violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government and the State of Illinois have sustained because of defendant's false or fraudulent claims, plus the maximum civil penalty for each violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*;

c.    That Plaintiffs be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

d.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' false or fraudulent claims, plus the maximum civil penalty for each violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*;

e.    That Plaintiffs be awarded all costs of this action, including expert witness fees, attorneys' fees and court costs; and,

    f.      That Plaintiffs recover such other relief as the Court deems just and proper.

Dated: April 4, 2016              Respectfully submitted,

                                 BEHN & WYETZNER, CHARTERED

                                 /s/ Linda Wyetzner

                                 By: Linda Wyetzner
                                 lwyetzner@behnwyetzner.com
                                 Daniel R. Hergott
                                 828 Davis Street, Suite 303
                                 Evanston, IL 60201
                                 312.629.0000 (Ph)
                                 224.420.3172 (Fax)

                                 SANFORD HEISLER, LLP

                                 H. Vincent McKnight
                                 vmcknight@sanfordheisler.com
                                 Altomease R. Kennedy
                                 akennedy@sanfordheisler.com
                                 John McKnight
                                 jmcknight@sanfordheisler.com
                                 1666 Connecticut Ave. NW, Suite 300
                                 Washington, DC 20009
                                 202.499.5217 (Ph)
                                 202.499.5199 (Fax)

                                 *Attorneys for Plaintiff-Relator Berkowitz*