| | | |
|---|---|---|
| United States of America *ex rel.* | ) | |
| Jeffrey Berkowitz, and | ) | |
| Jeffrey Berkowitz individually, | ) | No. 13 C 08185 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| Automation Aids; A&E Office and | ) | |
| Industrial Supply; Support of | ) | |
| Microcomputers Associated; | ) | |
| Aprisa Technology LLC; Supply | ) | |
| Saver Corporation; United Office | ) | |
| Solutions, Inc.; Vee Model | ) | |
| Management Consulting; | ) | |
| Caprice Electronics, Inc.; and | ) | |
| Computech Data Systems, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a *qui tam* action brought by relator Jeffrey Berkowitz on behalf of the United States government. Berkowitz is president of a company that sells office supplies to government agencies. R. 22, Third Am. Compl. ¶¶ 10, 21.[1] Defendants are competing vendors in Berkowitz's industry. *Id.* ¶¶ 9, 22-30. Through Berkowitz's regular business dealings, he allegedly discovered that Defendants were violating the False Claims Act, 31 U.S.C. §§ 3729-33, *et seq.*, by making false statements about some of the products they were selling to the General Services Administration ("GSA"). *Id.* ¶¶ 1, 10, 14. Berkowitz says Defendants certified that

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

their products complied with all relevant federal vendor regulations, even though some of the listed products violated what are known as "country of origin" restrictions. *Id.* ¶¶ 2, 7-9, 14. Berkowitz thus brought suit as a relator under the False Claims Act against the Defendants, demanding treble damages and forfeitures.[2] *Id.* ¶¶ 154-171. The Defendants now move to dismiss Berkowitz's claims. All Defendants (except Aprisa) move to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6) and 9(b), arguing, among other things, that Berkowitz has failed to plead fraud with enough particularity.[3] Aprisa also moves to dismiss, but solely under Federal Rule of Civil Procedure 12(b)(1) and solely on the ground that there is no subject matter jurisdiction for the claims against it. *See* R. 132, Aprisa Mot. to Dismiss. For the reasons discussed below, all Defendants' motions to dismiss are granted, except Aprisa's Rule 12(b)(1) motion, which is denied.

## I. Background

For purposes of this motion, the Court accepts as true the allegations in the Third Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Defendants are vendors that sell products to the United States government's General Services Administration. Third Am. Compl. ¶ 2. To sell to the GSA, a vendor must be

---

[2]This Court has jurisdiction over the claims under 31 U.S.C. § 3732, conferring jurisdiction over actions brought under 31 U.S.C. §§ 3729 and 3730. Federal-question jurisdiction also applies. 28 U.S.C. § 1331.

[3]*See* R. 102, Computech International Inc. Mot. to Dismiss; R. 105, Support of Microcomputers Associated Mot. to Dismiss; R. 108, Vee Model Management Mot. to Dismiss; R. 111, A&E Mot. to Dismiss; R. 116, Automation Aids Mot. to Dismiss; R. 121. Supply Saver Mot. to Dismiss; R. 124, Caprice Mot. to Dismiss; R. 193, United Office Solutions Mot. to Dismiss.

Three Defendants also assert improper venue. *See* Automation Aids Mot. to Dismiss ; Supply Saver Mot. to Dismiss; Caprice Mot. to Dismiss. And A&E argues that the wrong party was sued. A&E Mot. to Dismiss.

awarded a GSA Federal Supply Schedule contract under a specific "Schedule": Schedule 70, for instance, deals with information technology equipment; Schedule 51 deals with hardware supplies; and so on. *Id.* ¶¶ 4-5, 39-40.

All vendors pursuing GSA Schedule contracts need to comply with the Trade Agreements Act of 1979, 19 U.S.C. § 2501 *et seq.*, which, according to the GSA's online guidance on the Act, allows "only U.S. made or designated country end products" to be "offered and sold under Schedule contracts." Third Am. Compl. ¶ 7 (citing guidelines page on General Services Administration website).[4] The list of allowed countries is determined by "numerous multilateral and bilateral international trade agreements and other trade initiatives." *Id.*

The interplay between these "numerous … agreements" and "initiatives" is labyrinthine,[5] but ultimately: to determine which countries are acceptable ("designated," to use procurement parlance) for the purposes of GSA Schedule contracts, one looks at whether a country has an official trade agreement for that type of product with the United States under the World Trade Organization's Government Procurement Agreement. Third Am. Compl. ¶¶ 42-49. So for the types

---

[4]General Services Administration, *Ordering Guidelines*, http://www.gsa.gov/portal/content/200369?utm_source=FAS&utm_medium=print-radio&utm_term=schedules-ordering&utm_campaign=shortcuts (under "Trade Agreements Act Information" subheading).

[5]There are several intervening steps between the Act and its impact on GSA contracts that are not directly relevant in this case. In brief: 19 U.S.C. § 2503(c)(2) applies the Trade Agreements Act of 1979 to the Agreement on Government Procurement. The World Trade Organization Government Procurement Agreement allows industries from WTO member countries to compete for government contracts alongside domestic companies. Federal Acquisition Regulation 25.403(a). Through the Federal Acquisition Regulations' interaction with the Trade Agreements Act, the WTO Agreement applies to the General Services Administration. Federal Acquisition Regulation Subpart 25.4 ("Trade Agreements").

of products at issue here, Great Britain (to pick an example) is in, whereas China and Thailand are out. *Id.* ¶¶ 46, 49. The Federal Acquisition Regulations (known in the industry as "FAR"), which the General Services Administration is bound by, make things easier by specifically identifying the "designated" countries, and by defining "designated country end product" as a product made in one of the listed designated countries. FAR 52.225-5(a).

Relator Jeffrey Berkowitz is President of Complete Packing and Shipping Supplies, Inc. in Freeport, New York, which sells office supplies and other things to federal government agencies. Third Am. Compl. ¶¶ 21, 96. More specifically, Berkowitz's company sells office supplies, packaging and shipping supplies, information technology products, and janitorial maintenance supplies to the General Services Administration. *Id.* ¶¶ 96-97.

Around 2005, Berkowitz allegedly became aware that various vendors were selling items to the General Services Administration that were not from the United States or from "designated" countries. Third Am. Compl. ¶¶ 10, 98. He determined this by comparing product lists that he received in the course of his business (the lists reflected the products' country of origin) with data on products being sold to the government by other vendors. *Id.* ¶ 99. While he made sure that his business "carefully screened" out non-compliant products, he found that some of his competitors were allegedly not doing the same. *Id.* ¶¶ 99-100. Berkowitz recorded these comparisons in reports, merging country-of-origin data with vendor sales data. *Id.* ¶ 101. He acknowledges that there are some narrow exceptions to the

GSA's bar on buying products from countries not on the list, but argues that none of those exceptions applies to Defendants. *Id.* ¶¶ 8, 78-95.[6]

Berkowitz claims that Defendants have violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, by "making material false statements and presenting false claims to the United States." Third. Am. Compl. ¶¶ 12, 14. More specifically, he contends that he "discovered that Defendants certified these products [from undesignated countries] as having been manufactured in designated countries." *Id.* ¶ 11. He arrives at that allegation through a chain of inferences, starting with the fact that each contract between the government and a vendor should incorporate a Trade Agreements Certificate. *Id.* ¶¶ 52-55. On that certificate, either the vendor affirms that all of the listed products meet the United States or designated-country manufacturing requirement, or the vendor provides, in a separate subsection, a list of products that do not meet the requirement. *Id.* ¶ 54.

Berkowitz argues that the Defendants must not have identified non-compliant products' true origins on the relevant certificate before selling those goods to the government, because if Defendants had done so, then according to the

---

[6]Government contract officers are allowed to purchase some "open market" items (that is, items not bound by the country-of-origin requirements) in certain situations: (1) for "micro-purchases" of less than a few thousand dollars, FAR 8.405-1(b); defined at FAR 2.101; or (2) when a product is unavailable within the usual market and competition between vendors can be established in order to award the low offer, FAR 25.502(b)(3); or (3) in the case of large "open market" purchases ($150,000 and above), if a formal "Request for Quotation" is publicized allowing all vendors to bid, FAR 8.405-2(c). *See also* Third Am. Compl. ¶¶ 78-95. In addition, there is a monetary threshold (currently around $200,000) that must be triggered for the Trade Agreements Act to kick-in on products covered under the World Trade Organization Government Procurement Agreement. *Id.* ¶¶ 50-51. Berkowitz contends that this "TAA threshold was always met, and the TAA applied to these Defendants at all times." *Id.* ¶ 51.

Federal Acquisition Regulations, either the entire offer would have to have been rejected by the government or the offer would have been subjected to an analysis by the government under one of the narrow "open market" exceptions. Third. Am. Compl. ¶¶ 71-74. Berkowitz argues that because neither of these things ostensibly happened, the Defendants must not have been truthful in their representations to the General Services Administration, and are thus liable under the False Claims Act. *Id.* ¶ 72.

Berkowitz lists each alleged non-compliant product category sold by Defendants in a series of exhibits. *See* Third Am. Compl., Exhs. E, I-K, M-X. The summed-up values are presented in the body of the Complaint. Automation Aids allegedly sold 19,697 non-compliant products worth $1,015,448 from April 2010 to June 2013 and an additional $60,214 worth up to February 19, 2014. *Id.* ¶ 106. A&E allegedly sold 16,751 non-compliant products worth $590,645 from April 2010 to June 2013 and an additional $1,378,808 worth up to September 30, 2015. *Id.* ¶ 112. Support of Microcomputers Associated allegedly sold 15,525 non-compliant products worth $1,333,343 from April 2010 to June 2013 and an additional $2,754,099 worth up to October 6, 2015. *Id.* ¶ 116. Aprisa allegedly sold 18,431 non-compliant products worth $537,622 from April 2010 to June 2013 and an undisclosed additional amount between August 23, 2007 and December 30, 2014. *Id.* ¶ 120. Supply Saver allegedly sold 5,087 non-compliant products worth $922,843 from April 2010 to June 2013 and an additional $6,620,911 worth between January 5, 2010 and March 31, 2015. *Id.* ¶ 124. United Office Solutions allegedly sold 12,216

non-compliant products worth $597,971 from April 2010 to June 2013. *Id.* ¶ 127. Vee Model Management Consulting allegedly sold 1,743 non-compliant products worth $381,935 from April 2010 to June 2013 and an additional $1,672,513 worth up to April 1, 2015. *Id.* ¶ 130. Caprice Electronics, Inc. allegedly sold 39,621 non-compliant products worth $687,047 from April 2010 to June 2013 and an additional $1,364,189 worth between January 1, 2014 and December 31, 2015. *Id.* ¶ 133. Computech allegedly sold 7,987 non-compliant products worth $603,668 from July 1, 2013 to October 29, 2014 and an additional $747,428 worth since January 1, 2009. *Id.* ¶ 137.

Berkowitz asserts that he meets the conditions to be an "original source" under 31 U.S.C. § 3730(e)(4), as he has independent knowledge of Defendants' violations that did not come from any previous public disclosure. Third Am. Compl. ¶¶ 16-17. Defendants now move to dismiss Berkowitz's suit for, among other things, failure to state a claim. The exception is Aprisa, which moves only on the ground that there is no subject matter jurisdiction over the claims against it.

## II. Standard of Review

All Defendants except Aprisa bring their motions under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion tests the sufficiency of the complaint, *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When reviewing a motion to dismiss under either rule, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the

plaintiff's favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Under Federal Rule of Civil Procedure 8(a)(2), any complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). These allegations "must be enough to raise a right to relief above the speculative level," *id.*, and must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The allegations entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

Ordinarily, under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But claims alleging fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure Rule 9(b), requiring that, "[i]n alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). So Rule 9(b) requires complainants to go further than the usual claim: fraud claims should "state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (internal

quotation marks omitted). In other words, fraud claims "must describe the who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (internal quotation marks and citation omitted).

Defendant Aprisa brings a 12(b)(1) motion. A Rule 12(b)(1) motion tests whether the Court has subject-matter jurisdiction, *Hallinan*, 570 F.3d at 820; *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). The plaintiff bears the burden of establishing subject matter jurisdiction. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). "When ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). "[A] factual challenge lies where the complaint is formally sufficient but the contention is that there is in fact no subject matter jurisdiction. … [W]hen considering a motion that launches a factual attack against jurisdiction, the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (internal quotation marks omitted).

## III. Analysis

## A. Rule 9(b)

Berkowitz brings four False Claims Act counts against the Defendants, contending that they made material false statements when certifying various goods to sell to the General Services Administration. Third Am. Compl. ¶¶ 154-171. As relevant to Berkowitz's counts, the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, holds liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A)-(B). To account for various amendments to the False Claims Act, Berkowitz brings four counts altogether: (i) "knowingly submitt[ing], and caus[ing] to be submitted, false or fraudulent claims for payment and reimbursement" *before* May 20, 2009, Third Am. Compl. ¶¶ 154-157; (ii) "knowingly submitt[ing], and caus[ing] to be submitted, false or fraudulent claims for payment and reimbursement" *after* May 20, 2009, Third Am. Compl. ¶¶ 158-161; (iii) "knowingly ma[king], us[ing], or caus[ing] to be made or used, material false  statements to obtain Federal Government payment for false or fraudulent claims" *before* June 7, 2008, Third Am. Compl. ¶¶ 162-166;[7] and (iv) "knowingly ma[king], us[ing], or caus[ing] to be made or used, material false statements to obtain Federal Government payment for false or fraudulent claims" *after* June 7,

---

[7]The 2009 Fraud Enforcement and Recovery Act of 2009, amending 31 U.S.C. § 3729, specified in a note that this subparagraph "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date." Pub. L. No. 111-21, 123 Stat. 1617 (2009).

2008, Third Am. Compl. ¶¶ 167-171.[8] For purposes of the Act, a "claim" is "any request or demand … for money" that "is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729 (b)(2)(A). Berkowitz alleges (and for now there is no dispute) that when the Defendants requested to be paid by the government for products tendered, they made claims covered by the Act. Third Am. Compl. ¶ 38.

The question is whether Berkowitz's allegations of fraud are specific enough to satisfy Federal Rule of Civil Procedure 9(b). The Seventh Circuit has consistently described what a plaintiff needs to do in order to satisfy Rule 9(b). Generally speaking, a suit alleging fraud should give "the who, what, when, where, and how: the first paragraph of any newspaper story." *E.g.*, *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Writing that first newspaper paragraph entails giving "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014) (internal quotation marks omitted); *see also United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 778–79 (7th Cir. 2016) (citing the same standards from *DiLeo* and *Grenadyor*); *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009); *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 377-378 (7th Cir. 2003) (demanding evidence of specific statements rather than blanket allegations); *United*

---

[8]The 2009 amendment also resulted in minor wording changes to this subparagraph.

*States ex rel. Grant v. Thorek Hosp. & Med. Ctr.*, 2007 WL 2484333, at *2 (N.D. Ill. Aug. 29, 2007); *United States ex rel. Swift v. DeliverCareRx, Inc.*, 2015 WL 10521636, at *4 (N.D. Ill. Oct. 26, 2015); *United States ex rel. Bragg v. SCR Med. Transp., Inc.*, 2012 WL 2072860, at *1 (N.D. Ill. June 8, 2012); *United States ex rel. Ceas v. Chrysler Grp. LLC*, 78 F. Supp. 3d 869, 883 (N.D. Ill. 2015). The reason that Rule 9(b) requires more than the usual case is that "a public accusation of fraud can do great damage to a firm before the firm is exonerated in litigation (should the accusation prove baseless)." *United States ex rel. Bogina v. Medline Indus.*, 809 F.3d 365, 370 (7th Cir. 2016).

In line with the specificity requirement, conclusory allegations in relator cases are not enough; particular details of a fraud scheme must be pled. *United States ex rel. Gross v. AIDS Research All.-Chicago*, 415 F.3d 601, 605 (7th Cir. 2005); *United States ex rel. Dolan v. Long Grove Manor, Inc.*, 2014 WL 3583980, at *6 (N.D. Ill. July 18, 2014) (the complaint "is peppered with allegations that clinical and patient records and data were 'manipulated,' 'fabricated,' or 'falsified,' but nowhere does relator tell us what any particular record contained"). A fraudulent claim should not be pled from a broad aerial view, but instead must allege that a defendant made a false claim "at an individualized transaction level." *United States ex rel. Wildhirt v. AARS Forever, Inc.*, 2011 WL 1303390, at *5 (N.D. Ill. Apr. 6, 2011) (citing *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 741–42 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009)). And voluminous exhibits by

themselves do not automatically satisfy Rule 9(b) and will not otherwise save a complaint that never arrives at specifics of the who, what, when, where, and how. *See DiLeo*, 901 F.2d at 627; *Bragg*, 2012 WL 2072860, at *2; *Ceas*, 78 F. Supp. 3d at 882  (giving 37 examples of alleged fraudulent activity based solely on one type of report will not satisfy Rule 9(b) if that type of report is not particular enough for pleading purposes).

To be sure, in evaluating a fraud claim's particularity, a plaintiff is entitled to reasonable inferences. But only to a point: enough underlying details must still be pled to make the inferences meaningful in the first place. *Grenadyor*, 895 F. Supp. 2d at 880 (inference would have been viable if it were coupled with a distinct identification of a party but was otherwise insufficient under Rule 9(b)); *Ceas*, 78 F. Supp. 3d at 880 (a "facially cogent theory" nevertheless fails Rule 9(b) when it cannot allege specific documented instances of fraud). Nor may inferences be piled on top of one another to "reverse-engineer" a complaint. *Ceas*, 78 F. Supp. 3d at 882 (complaint fails Rule 9(b) because "[p]laintiff continues to reverse-engineer his complaint by stacking additional inferences onto his core allegation"). At the same time—and not surprisingly given the infinite variety of contexts in which cases arise—when applying Rule 9(b), district courts must be sensitive to the specific factual circumstances of each case, rather than mechanically insisting on the identical level of detail in every case. *Pirelli Armstrong*, 631 F.3d at 441-42. For instance, take a boutique hotel that posts pictures online of a $1000 luxury suite as the promised room, but then the real room is in fact a broom closet. *Someone* at the

hotel, it is reasonable to say, committed a fraud, and even if the plaintiff cannot identify the specific "who" at the outset of the case, Rule 9(b) would probably be satisfied.

Measured by these governing principles, the complaint here fails Rule 9(b)'s particularity requirement. As described earlier, Berkowitz puts together his suit by combining product lists (specifying the origin of the products) received in the course of his ordinary business with "data regarding products sold by the Defendants." Third Am. Compl. ¶ 100. Using these streams of information, Berkowitz created his own "reports," allegedly showing that Defendants were selling non-compliant goods to the government. *Id.* ¶ 101. He attaches 24 exhibits (not including one summary of all the exhibits) to the Third Amended Complaint:

> four exhibits detailing communications from the General Services Administration regarding vendor requirements and reminders that presumably would have gone to each Defendant (Exhs. A-D);
>
> nine "Sales Data" spreadsheets, one per Defendant, with columns for "Contractor," "Agency," "Sale Date," "Part Number," "Manufacturer," "Quantity," and "Amount," (Exhs. E, I-K, M-Q);
>
> four General Service Administration letters to contractors about non-compliant products and associated requests to remove the products from the online portal (Exhs. F-H, L) and in one case (Exh. L) an internal email from a Defendant reacting to a GSA Letter; and
>
> seven "Open Market Violations" spreadsheets for various Defendants, with columns for "Order ID"/"Invoice Number" and "Value of Sole-Sourced [Non-Designated-Country] Products" (Exhs. R-X).

Generally speaking,[9] it is possible to reasonably infer from these exhibits that the Defendants sold supplies made in non-designated countries to the government. With that factual premise in hand, Berkowitz then alleges that each time the Defendants submitted a claim to the government for payment, the Defendants were *impliedly* certifying that the supplies were made in a designated country—and that they did so with the intent to defraud.

Viewed as a pure question of law, it is true that a False Claims Act claim may be premised on an *implied* certification theory. The Supreme Court said so last Term. *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1999 (2016).[10] If a claimant seeks payment for a specified good or service and fails to disclose that the good or service violates a "material" statutory, regulatory, or contract-based requirement, then it is possible to establish False Claims Act liability on an implied certification theory. Put another way, material omissions, not just affirmative misrepresentations, can form the basis for False Claims Act liability. So, here, Berkowitz is not precluded—at least not as a matter of law—from relying on an implied certification theory.

---

[9]The exhibits that purportedly support the alleged "Open Market Violations" are less illuminating than the exhibits for the other claims because the Open Market exhibits provide only an Order ID number and an amount. Third Am. Compl. Exhs. R-X. And even some of the allegations on the non-Open Market products are hedged with qualifiers as to the country of origin. *See, e.g., id.* ¶ 116: "Exhibit J to the Complaint lists these 15,525 representative sales. Relator further identified an additional $2,754,099 worth of non-compliant sales extending from August 4, 2009 through October 6, 2015. *Most* of these sales were of items manufactured in China." (emphasis added).

[10]Under the theory of implied false certification, because a Defendant agreed to comply with the Trade Agreements Act when it originally received its Schedule contract from the General Services Administration, that Defendant implicitly certified that it was compliant with the Act every time it sold products to the government.

But just because it is possible to rely on an implied certification theory of liability does not mean, of course, that simply alleging that theory will satisfy Rule 9(b). Indeed, it is safe to say that satisfying Rule 9(b) often will be tougher to do in implied certification cases than in cases with an outright affirmative misrepresentation. Tougher *not* because the implied certification theory of liability is disfavored as a matter of law in any way, but only because Rule 9(b) is (as Berkowitz himself urges) sensitive to the factual context of each case. Sure, sometimes an omission will be so glaring (and so important) that an inference of fraud arises just as readily as if the defendant made an affirmative misrepresentation on the same point. But usually it will be easier to set forth the specific details of a fraud scheme that is premised on affirmative *lies* than it is to sufficiently allege the specifics of a scheme based on material *omissions*.

That is the problem with Berkowitz's complaint. Even if the products sold by the Defendants were made in non-designated countries, there are no particularized allegations on specifically *who* engaged in the fraud, and *what* they did to execute it. Most important of all, there are no specific allegations from which to reasonably infer that someone in each company *knew* that the company was selling non-compliant products to the government; that the same someone also *knew* that the Trade Agreements Act required that the products be made only in certain countries; and that the same someone *knew* that the submitted claims amounted to an implied certification that the goods were in compliance with all statutory and regulatory requirements, so the someone decided to omit the country of origin from the

submitted claims. Without more specific allegations about the fraud schemes executed by each of the Defendants, really what is alleged is a breach of contract, not fraud.

The closest that Berkowitz comes to nudging the claim away from a breach of contract to a fraud is when he alleges that two of the Defendants received notices from GSA about noncompliance with the Trade Agreements Act. In 2010, Defendant Automation Aids received three "general notifications" from GSA. Third Am. Compl. ¶¶ 108-110. Those general notices flagged that certain products on Automation Aids' "Electronic Catalog on GSA *Advantage!*" were noncompliant with the Trade Agreements Act. *Id.,* Exhs. F, G, H. In September 2012, Defendant Aprisa also received a similar "general" notification from GSA, arising again from a review of the "Electronic Catalog." *Id.*, Exh. L. But that's all. Those notices were based on reviews of *catalogs*, not submitted claims, so once again Berkowitz asks too much of the allegations to reasonably infer fraud, rather than a breach of contract or a simple mistake. Indeed, the Aprisa exhibit to the Third Amended Complaint includes a quick-action email from one Aprisa employee to another, attaching the GSA email notification (which had been received three minutes earlier) and giving the instruction, "CHECK IF WE HAVE ON CONTRACT IF SO REMOVE IT." *Id.*. That exemplifies why, in the context of the sprawling federal procurement statutory and regulatory framework, inferring fraud from those few general notices is not reasonable.

Berkowitz argues that discovery will reveal information, obtained from the Defendants, on the alleged fraud. *See, e.g.*, R, 145, Pl.'s Resp. Br. at 10-12. But that will almost always be true when accusing a defendant of fraud. To be sure, as noted earlier, if a plaintiff has already pled some circumstances of the alleged fraud with enough particularity, then courts may sometimes flexibly apply Rule 9(b) for other related parts of the alleged scheme. *See, e.g.*, *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998) ("[Plaintiff's] complaint identifies certain other Rosewood residents to whom the various misrepresentations were communicated, and with respect to the identified residents, he details the circumstances of the alleged frauds with sufficient particularity. To the extent the complaint makes allegations relating to other classes of unidentified Rosewood residents, however, we believe that Rule 9(b)'s particularity requirement must be relaxed if [defendant solely controls such information]."). But a plaintiff only gets that leniency if some other elements of the fraud scheme are alleged with enough particularity. Berkowitz has not done that.

The absence of specifics on the fraud scheme in the Third Amended Complaint might very well arise from the fact that Berkowitz is not a whistleblowing insider of any of these firms. Instead, he is a competitor in the same industry. Of course, that does not at all disqualify him from advancing a False Claims Act against his competitors, but at the same time, he is not entitled to *more* leniency than others in hurdling Rule 9(b). If it is usually easier to bring a *qui tam* fraud claim from the inside of a company rather than from the outside, that is not

some accidental defect in the law but a natural consequence of Rule 9(b). *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1016-17 (7th Cir. 1999) (discussing "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute on their own") (internal quotation marks omitted).

The cases cited by Berkowitz do not help him. Almost all of them involve alleged frauds pled with much more particularity than Berkowitz can muster, and all of them apply the same Rule 9(b) standards explained earlier. Berkowitz cites *Tomera v. Galt* to argue that "the level of particularity required under Rule 9(b) is often misunderstood, as Rule 9(b) must still be read together with Rule 8, which only requires 'a short and plain statement of the claim … .'" Pl.'s Resp. Br. at 7-8 (citing *Tomera v. Galt*, 511 F.2d 504, 508 (7th Cir. 1975), *overruled on other grounds by Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385 (7th Cir. 1990)). *Tomera* does indeed discuss Rule 9(b)'s relation to Rule 8's simple goal of giving a defendant notice of the nature of the plaintiff's claims. But this does not mean that the Rule 9(b) standard collapses into the Rule 8 standard.[11] Indeed, *Tomera* itself says that to give proper notice through Rule 9(b), more particularity of the fraud's circumstances is required in the pleading. *Tomera*, 511 F.2d at 508. So that opinion is saying the same thing as the bulk of the Rule 9(b) cases discussed earlier, just with an added detail about a relationship to Rule 8.

---

[11]A 1975 opinion on notice pleading must also be used with caution in light of the pleading standards elaborated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Berkowitz's reliance on *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016 (7th Cir. 1992), runs into a very similar problem of selective quotation. Pl.'s Resp. Br. at 8. *Midwest* (like *Tomera*) links the reasoning behind Rule 9(b) with the "notice" language of Rule 8: "Rule 9(b) requires that a RICO plaintiff provide only a general outline of the alleged fraud scheme—one sufficient to reasonably notify the defendants of their purported role in the scheme … ." *Midwest Grinding Co.*, 976 F.2d at 1020. But in the second half of the *same* sentence, the opinion says that the complaint must nevertheless "at minimum, describe the predicate acts with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud." *Id.* (internal quotation marks omitted). Berkowitz's complaint does not meet these "minimum" requirements and thus gets no shelter in *Midwest.*

Berkowitz also cites to *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436 (7th Cir. 2011), for sympathetic language about flexibility in fraud pleading: "courts and litigants often erroneously take an overly rigid view of [9(b)] formulation"; "the district court was incorrect when it suggested that [relator] need[ed] to point to specific misrepresentations made by particular [individual employees of defendant]." Pl.'s Resp. Br. at 9, 11 (citing *Pirelli*, 631 F.3d at 441-42, 446). As discussed earlier in this Opinion, however, *Pirelli* was making the important but uncontroversial points that the "who," "what," "where" standards of Rule 9(b) should not be followed reflexively and that each case's facts must be

given consideration. As explained earlier, in the context of Berkowitz's alleged material-omissions fraud scheme, the allegations fall short.

Other cases that Berkowitz cites can be readily distinguished because the relators in those cases were almost always in one way or another providing more particular information in their complaints. *Lusby*, 570 F.3d 849 (complainant cites specific conversations, dates, places, and payment methods); *United States ex rel. Cieszyski v. LifeWatch Servs., Inc.*, 2015 WL 6153937, at *3-4 (N.D. Ill. Oct. 19, 2015) (complaint cites specific people, billing codes and fraudulent methods);[12] *United States ex rel. Oughatiyan v. IPC The Hospitalist Co., Inc.*, 2015 WL 718345, at *6 (N.D. Ill. Feb. 17, 2015) (complainant provides "claim number, date of service, code billed, date received, date paid, and amount paid" for alleged fraudulent "upcoding" transactions in a physician practice group). Compared with these cases, Berkowitz does not provide enough particular information to move forward.

For all those reasons, the False Claims Act counts against the Defendants who moved under Rule 12(b)(6) (which is all of them except Aprisa) are dismissed. For those Defendants, there is no need to evaluate the other theories of dismissal.[13] Nor may Berkowitz amend his complaint, despite his vague suggestion that he has

---

[12]Here is an example of the level of detail of fraud pled in *Cieszyski*: "Patient D.T., who received Holter testing in April 2013. A non-certified Indian technician, P. Ramachandran, prepared the report to be submitted to D.T.'s physician[] and then another technician in the United States replaced the Indian technician's information with his own, placing an asterisk by his name to indicate that the work had been done by a non-certified technician in India." *Cieszyski*, 2015 WL 6153937, at *4 n.7 (N.D. Ill. Oct. 19, 2015) (internal quotation marks omitted).

[13]On the joinder and the venue arguments brought by some of the Defendants, *see* Automation Aids Mot. to Dismiss; Supply Saver Mot. to Dismiss; Caprice Mot. to Dismiss, it is indeed questionable whether joinder of all the disparate Defendants was proper and whether venue as to all the Defendants is really proper in this District.

further information he could file.[14] He does not actually specify what the additional allegations might be, and more importantly, this is already his *third* amended complaint. The claims are dismissed with prejudice.

## B. Aprisa's First-to-File Defense

Aprisa brings a motion to dismiss under Rule 12(b)(1), and the only ground that the motion asserts—as would be expected for a Rule 12(b)(1) motion—is that there is no subject matter jurisdiction over Berkowitz's claims against Aprisa. Aprisa invokes the "first-to-file" bar under the False Claims Act. 31 U.S.C. § 3730(b)(5). Specifically, in August 2012 (over a year before this case was filed), a different relator filed an under seal *qui tam* action in the United States District Court for the District of Columbia against Aprisa and others for allegedly fraudulent vendor claims, premised on violations of the Trade Agreements Act. R. 98, Aprisa Br. at 1. Because of this, Aprisa argues, , Berkowitz's suit must be dismissed because he was beat to the punch by the earlier *qui tam* relator. Aprisa characterizes the first-to-file bar as an absence of subject matter jurisdiction. Aprisa Br. at 1.

Aprisa's arguments fail because (1) the first-to-file bar is not jurisdictional, so a Rule 12(b)(1) motion is thus the wrong vehicle to make the argument; and (2) even if Aprisa's first-to-file argument is converted into a Rule 12(b)(6) motion, Aprisa has

---

[14]Pl.'s Resp. Br. at 16 n.7: "Regardless, Berkowitz has additional information regarding Defendants' pre-2008 fraudulent sales and is prepared to amend the Complaint in order to provide this supplemental information. Relator believes that additional corroborating evidence regarding pre-2008 false claims will come to light during discovery. Relator hereby requests leave to amend his complaint accordingly, should the Court deem it necessary."

not established that the overlap between the *qui tam* suits meets the first-to-file bar. On the threshold point: the "first-to-file" bar is not an issue of subject matter jurisdiction. A statutory limitation will be considered a genuine jurisdictional bar only if Congress explicitly writes it to be so. *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) ("To ward off profligate use of the term 'jurisdiction,' we have adopted a readily administrable bright line for determining whether to classify a statutory limitation as jurisdictional. We inquire whether Congress has clearly stated that the rule is jurisdictional; absent such a clear statement, we have cautioned, courts should treat the restriction as nonjurisdictional in character." (internal citations and quotation marks omitted)); *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 120 (D.C. Cir. 2015) (explaining the same). As the D.C. Circuit has convincingly explained, the False Claims Act's first-to-file provision says nothing about jurisdiction and thus should not be considered jurisdictional. *Heath*, 791 F.3d at 119-21. Instead, the first-to-file bar arises from this statutory text: once a *qui tam* action is filed, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). That statutory text does not use the word "jurisdiction," as in "no court shall have jurisdiction over an action based on the facts underlying the pending action." Really, the first-to-file bar functions more like a preclusion defense rather than a jurisdictional ban. The D.C. Circuit's explanation of the non-jurisdictional nature of the first-to-file bar is persuasive. Also, subject matter jurisdiction is an issue that a federal court can and must raise at any time on its own. *Craig v.*

*Ontario Corp.*, 543 F.3d 872, 875 (7th Cir. 2008) ("Subject-matter jurisdiction is so central to the district court's power to issue any orders whatsoever that it may be inquired into at any time, with or without a motion, by any party or by the court itself."). But it is virtually impossible for a court to raise a first-to-file bar on its own: how would a court know about the other pending *qui tam* actions, especially when they are routinely filed under seal? So Aprisa's Rule 12(b)(1) motion must be denied because the first-to-file bar is not jurisdictional.

Having said that, it is possible to consider Aprisa's "first-to-file" argument under Rule 12(b)(6)—that is, as an argument that the Third Amended Complaint does not state a claim in light of the first-to-file bar. *Peckmann v. Thompson*, 966 F.2d 295, 297 (7th Cir. 1992) ("If a defendant's Rule 12(b)(1) motion is an indirect attack on the merits of the plaintiff's claim, the court may treat the motion as if it were a Rule 12(b)(6) motion..."). In doing so, the D.C. *qui tam* suit could still be considered as a matter of public record without automatically converting the motion to one for summary judgment. *Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir. 1994).

Under 31 U.S.C. § 3730(b)(5), once a *qui tam* action is filed, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." In defining "related," the Seventh Circuit follows the standard given in *United States ex rel. Chovanec v. Apria Healthcare Group, Inc.,* 606 F.3d 361 (7th Cir. 2010):

> [W]e read "related action based on the facts underlying the pending action" to specify only the materially similar situations that objectively reasonable

readings of the original complaint, or investigations launched in direct consequence of that complaint, would have revealed … .

*Id.* at 365. There are basically two ways for the later-filed action to trip on the first-to-file bar: (1) the actions are related based on materially similar situations discernible from the original complaint itself; or (2) the actions are related if an investigation launched because of the first would have revealed information about the second. Aprisa believes both of these paths should serve to bar Berkowitz's suit.

Aprisa first contends that the current case and the D.C. case are materially similar through an objectively reasonable reading of the original complaint. The D.C. case deals with American Power Conversion (APC) products sold to the government and Berkowitz's suit explicitly does not relate to APC products, *see* Third Am. Compl., Exh. S (specifying on Aprisa product spreadsheet "No APC Products"). Nevertheless, Aprisa believes the two cases are materially similar because Berkowitz's case is a "mere[ ] variation…" of the D.C. suit, only alleging "additional or somewhat different details about the defendant's fraud." Aprisa Br. at 7 (quoting standard in *United States ex rel. Batty v. Amerigroup Ill., Inc.*, 528 F. Supp. 2d 861, 873 (N.D. Ill. 2007)). Aprisa also argues that Berkowitz's allegations about fraud in the "Open Market" transactions are further mere variations covered in the D.C. suit's allegations, even if the D.C. suit does not use the same nomenclature. Aprisa Br. at 7-8.

But the Third Amended Complaint has taken care to make sure that the claims on which Berkowitz is suing Aprisa are *not* those that are covered by the D.C. suit. Different products and different submitted claims for those products set

this complaint against Aprisa apart from the first one. To be sure, there might be an overlap in how the alleged fraud was executed; as discussed earlier, Rule 9(b) has not been satisfied, so the specifics of the frauds are not known. But, still, it is not as if the relief in the D.C. complaint would cover the relief sought in this one. This difference is enough to trigger the first-to-file bar by simply comparing the faces of the complaints.

Aprisa submits that if the complaint-comparison approach is not enough to invoke the bar, then the second way to trigger it does apply, that is, "investigations launched in direct consequence" of the D.C. complaint would have revealed information about the products at issue in this case. Aprisa asserts that it is a small company, and the D.C. filing would have sparked a government investigation that would readily cover the entire outfit's operations: "Aprisa is a tiny company located in one office on Long Island with no faraway personnel or rogue employees. Once the D.C. action was filed, GSA and the Justice Department were fully equipped to investigate whether APC products – *and any other products that Aprisa was selling to GSA* – were TAA compliant." R. 147, Aprisa Reply Br. at 5 (emphasis in original).

That argument too cannot prevail as this stage of the litigation. Aprisa did not mention this line of argument—that its small size would have resulted in disclosure of the other alleged products—until its reply brief. So Berkowitz has not had a chance to respond to this argument. More importantly, there is nothing about the size and scope of Aprisa's operations in the record. On a dismissal motion, the Court is not in a position to make factual determinations that Aprisa needs to win

on the investigation-based version of the first-to-file bar. So Aprisa's motion to dismiss must be denied.

But that leaves just Aprisa as the sole remaining Defendant. Aprisa originally filed a motion to join, *en masse*, any other Defendant's Rule 9(b) motion. R. 134, Aprisa Mot. to Join. But the Court rejected that motion, explaining: "it is not fair to Plaintiff or to the Court to try figuring out how the joined arguments (which Aprisa attempts to join en masse, except the argument rejected by the United Health Services decision) apply to Aprisa. It would be one thing if the Defendants had coordinated their briefing so that generally applicable arguments (or arguments that applied to multiple Defendants) could be presented jointly, but that did not happen." R. 138, Minute Entry (June 22, 2016).[15] After the motion to join *en masse* was rejected, Aprisa could have filed a motion to supplement its own dismissal motion and make its own Rule 9(b) arguments. But it did not do that.

If Aprisa still wishes to make a Rule 9(b) argument under Rule 12(b)(6), and if Berkowitz objects to allowing Aprisa to do, then Aprisa must file a motion by March 30, 2017, explaining why it should be granted leave to file another dismissal motion at this stage of the litigation and after filing the Rule 12(b)(1) motion. And if Aprisa wants to advance an improper venue argument, then the motion for leave must also address why that should be permitted.

---

[15]Indeed, as it turns out (at least as far as Berkowitz was able to plead), Aprisa was one of only two Defendants that received a general notice from GSA about noncompliant products on its Electronic Catalog, which was the closest to specific that Berkowitz came in this fraud suit. It ended up not mattering, but that shows why just joining another motion is usually not a fair way to present an argument that might be party-specific.

## IV. Conclusion

For the reasons discussed, the motions to dismiss for Automation Aids, A&E Office and Industrial Supply, Support of Microcomputers Associated, Supply Saver Corporation, United Office Solutions, Inc., Vee Model Management Consulting, Caprice Electronics, Inc., and Computech Data Systems are granted. The claims against those Defendants are dismissed with prejudice. Aprisa's motion to dismiss is denied, but Aprisa may seek leave, by March 30, 2017, to file another dismissal motion. A status hearing is set for April 4, 2017, at 9 a.m.

ENTERED:

<u>   s/Edmond E. Chang   </u>
Honorable Edmond E. Chang
United States District Judge

DATE: March 16, 2017